[Crim. No. 223.  Department Two.—October 4, 1897.]

THE PEOPLE, Respondent, v. JAMES HOLMES et al., Appellants.

CRIMINAL LAW—HOMICIDE—INVOLUNTARY MANSLAUGHTER—INFORMAL VERDICT —USE OF WORDS "NOT A FELONY"—SURPLUSAGE—PROVINCE OF JURY.—A verdict of guilty of involuntary manslaughter, found against defendants jointly indicted and tried for murder, is rendered informal by adding thereto the words "not a felony," and persisting in their use against an instruction of the court to reconsider the verdict and strike them out; but where the jury added the further words, "as charged and laid down by the court under the head of involuntary manslaughter," and it appeared that the court in its charge used the words "acts not amounting to felony" taken from the code definition of involuntary manslaughter, and the jury further recommended the defendants "to the extreme mercy of the court in its sentence and punishment," whatever may have been their intention in using the words "not a felony," their verdict cannot be construed as intended to acquit the defendants, but should have a reasonable construction to give effect to their manifest intention to convict them of involuntary manslaughter, and those words should be rejected   as surplusage, it not being within the province of the jury to determine whether involuntary manslaughter was or was not a felony, which is determined by the statute, and the general verdict of "guilty of involuntary manslaughter," should stand as the verdict of the jury.

ID.—MOTION FOR NEW TRIAL—AFFIDAVIT OF JURORS—IMPEACHING VERDICT. —Upon the hearing of a motion for new trial, the affidavits of jurors cannot be received to impeach their verdict; and the court properly refused to consider an affidavit of eight of the jurors to the effect that their verdict of "guilty of involuntary manslaughter, not a felony," was intended to find the defendants guilty of a misdemeanor only, and that the jury would not have agreed to convict the defendants of any manslaughter which was a felony.

ID.—PRESENCE OF DEFENDANTS—MINUTES OF COURT—CLERICAL ERROR—BILL OF EXCEPTIONS—APPEAL—PRESUMPTIONS AGAINST ERROR.—A clerical error in the minutes of the court in stating that "the jury, defendant and all counsel" were present at a time specified will be disregarded, where the bill of exceptions states that "defendants and respective counsel" were then present, nor can the defendants impeach the verity of the bill of exceptions, and if any of them were not present, that fact should have been made affirmatively to appear; nor is the silence of the record in failing to show that defendants were present when the verdict was rendered ground for reversal, all intendments upon appeal being in favor of the regularity of the judgment, and error will not be presumed, but the absence of the defendants, or any of them, must be made to appear affirmatively in the record.

ID.—EVIDENCE TO SUSTAIN VERDICT.—The evidence reviewed and held sufficient to warrant the jury in finding a verdict of guilty of involuntary manslaughter against the defendants.

Id.—DEATH FROM RUPTURE OF BLOOD VESSEL—HYPOTHESES—SPONTANEOUS RUP-
TURE—UNLAWFUL ACTS OF DEFENDANTS—INSTRUCTIONS—PROVINCE OF JURY.
It appearing that the immediate cause of the death of the deceased
was the rupture of a blood vessel, and the medical testimony being
such as to leave the question with the jury to decide whether the
rupture was spontaneous, or was the result of the unlawful acts of
the defendants, it was within the province of the jury either to
adopt or reject the hypothesis of spontaneous rupture, notwithstand-
ing instructions that if there was reasonable doubt of the cause of
the death, or if they could account for it upon any other hypothesis
than that of the guilt of the defendants, they must acquit the de-
fendants; and where the jury found the origin of the rupture to be
the treatment received by the deceased from the defendants, their
verdict cannot be disturbed upon appeal.

Id.—CONSPIRACY OF MEMBERS OF TRADE UNION TO PREVENT WORK—USE OF VIO-
LENCE—JOINT LIABILITY OF CONSPIRATORS—INSTRUCTION.—Where there was
evidence sufficient to leave the question with the jury as to the
nature and extent of a conspiracy of the members of a trade union,
including the defendants, to prevent the deceased from working,
and to assault him with violence for so doing, and tending to show
that some of the defendants assaulted the deceased without provo-
cation, and that all of the defendants aided, abetted and encourag-
ed the assault, it is proper to instruct the jury that "a conspiracy
exists when two or more persons conspire to commit an unlawful
act, or to commit a lawful act by unlawful means," and that "no
person has any right, by violence or unlawful means, to prevent an-
other from exercising a lawful trade or calling, or doing any other
lawful act," and that "if two or more persons conspire together to
prevent another person by violence or unlawful means" from so
doing, "and while engaged in carrying out such conspiracy they
(the conspirators) commit a felony or some other unlawful act not
amounting to a felony upon the body" of such person, "they are all
liable for the acts of any one of their number done in pursuance of
such conspiracy."

Id.—IMPORTANCE OF CONSPIRACY ELEMENT OF CRIME CHARGED.—Defendants
jointly indicted and tried for murder are not charged with the
crime of conspiracy; and the conspiracy element of the crime charg-
ed becomes important only as a means of establishing the com-
mission of the crime charged against the defendants jointly; but, in
this view, evidence is properly submitted to show a conspiracy, and
instructions are properly given defining it.

Id.—RESOLUTION OF STRIKING TRADE UNION—INTERVIEW OF NONUNION MEN—
CONDUCT OF MEMBERS—CONSPIRACY—QUESTIONS FOR JURY.—Although a res-
olution passed by the members of a trade union, who were engaged
in a strike, in reference to interviewing nonunion men, may not im-
port an intention to commit an unlawful act, or to do a lawful
act by unlawful means, yet it is competent to inquire into the sub-
sequent conduct of such members to ascertain whether or not there
was a joint intention, not disclosed by the resolution, formed at the
time of its passage or subsequently to do an unlawful act, or to do
a lawful act by unlawful means; and the questions how far their
conduct went to establish a conspiracy, and to what extent they
were involved in it, and when it was formed, if at all, and when

terminated, and whether the acts of violence proved were or were not part of an original design to force the deceased to quit work, and whether the crime alleged was committed in pursuance of the conspiracy, or was the independent act of some of the persons present, outside of and foreign to the common design, are questions exclusively for the jury.

ID.—ACTS OF DEFENDANTS AT TIME AND PLACE OF ASSAULT—TIME OF CONSPIRACY.—The acts of the defendants at the time and place of the assault may be considered by the jury, as tending to show the purpose and objects of the conspiracy in its inception; nor is it necessary that the jury should locate the conspiracy at any time prior to the coming of the defendants to the building where the assault was made; but it might have originated then and there.

ID.—INSTRUCTION CITING DECISION IN ANOTHER STATE.—The method of stating a rule in a charge to the jury as having been held in a cited decision of the highest court of another state is not to be commended, but it cannot be prejudicial where there is no error in the rule as stated, when considered as part of the whole instruction.

ID.—INSTRUCTION AS TO MURDER AND MANSLAUGHTER—CONSEQUENCES OF UNLAWFUL ACTS—VAGUE EXPRESSION NOT MISLEADING.—Where the jury has been correctly instructed by the court as to the distinction between murder and manslaughter, growing out of unlawful acts, a conclusion stating that "it follows, therefore, that if an act is unlawful, or is not as duty does not demand, and of a tendency directly dangerous to life, the destruction of life by it, however unintended, will be murder; but if the act, though dangerous, is not directly so, yet sufficient to come under the condemnation of the law, and death results from it, the homicide is manslaughter," taken as part of the whole instruction, does not enlarge the correct doctrine by making a person liable for all possible consequences; and though the expression "or is not as duty does not demand," is vague and uncertain, it could not have misled the jury.

ID.—INSTRUCTION AS TO INVOLUNTARY MANSLAUGHTER—APPLICABILITY TO CONDUCT OF DEFENDANTS—QUESTION FOR JURY.—When the charge of the court fully and correctly defined manslaughter, an extract therefrom to the effect that involuntary manslaughter was "killing in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection," is not objectionable as inapplicable to the conduct of the defendants, where their conduct was such as to make it a question for the jury whether any or all of the defendants did or did not do anything in connection with a request to the deceased to quit work, in an unlawful manner, or without due caution or circumspection, or whether force was used justifiably, or under such circumstances as to make the defendants aiders and abettors in an assault upon the deceased.

ID.—CROSS-EXAMINATION OF DEFENDANT.—A defendant offering himself as a witness may be cross-examined as to occurrences testified to in his examination in chief, where the cross-examination does not go beyond the limitations prescribed in section 1323 of the Penal Code, as construed by the decisions of this court.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order denying a new trial. Edward A. Belcher, Judge.

The affidavits of the jurors referred to in the opinion set forth that they did not wish to convict the defendants of any manslaughter which was a felony, and for that reason refused to change their verdict and to strike out the words "not a felony"; that they understood that they were convicting the defendants of something less than a felony, and their idea was to find them guilty of nothing more than a misdemeanor. Further facts are stated in the opinion.

Carroll Cook, and J. N. E. Wilson, for Appellants.

W. F. Fitzgerald, Attorney General, and Charles H. Jackson, Deputy Attorney General, for Respondent.

CHIPMAN, C.—Defendants were jointly indicted and tried for the murder of one C. A. Mars in the city and county of San Francisco, on the tenth day of March, 1896. They were convicted of involuntary manslaughter, and sentenced to one year in the state penitentiary. The appeal is from the judgment and the order denying motion for new trial.

The verdict is claimed to be erroneous for: 1. Insufficiency of evidence to support it; and 2. To be either void or in effect an acquittal by reason of its form. That portion of the verdict drawn in question is as follows:

"Second. We find a verdict of 'guilty' against all the others named in the indictment, to wit, against James Holmes, William Starr, D. Dunn, Neal Collins, W. Dowling, E. G. Waltz, and Walter McCoy, and find a verdict of 'Involuntary Manslaughter,' 'Not a felony,' as charged and laid down by the court under the head of involuntary manslaughter, and pray the extreme mercy of the court in its sentence and punishment, and so say we all."

1. When the verdict was brought in, the court refused to receive it, and directed the jury to reconsider it and to strike out the words "not a felony"; the jury again returned the verdict without change, and it was duly recorded. It is now said this was error, and also that the verdict was in effect an acquittal. The

court pursued the statute closely, and there is no serious question except as to the effect of the verdict. It is certainly informal, and the words, "not a felony," if given effect, contradict the words "guilty of involuntary manslaughter," which is a felony. It is made the duty of the court, by section 1161 of the Penal Code, where there is a verdict of conviction, to explain to the jury if they have mistaken the law, and direct a reconsideration of the verdict, and if the same verdict is returned it must be entered; but the court cannot require a reconsideration if it is a verdict of acquittal. The verdict clearly shows an intention to convict, and the grade of the offense is fixed by declaring it to be involuntary manslaughter. We cannot say what the jury meant by interpolating the words "not a felony," unless it be that they referred to the words "acts not amounting to a felony," which, when committed, constitute one form of involuntary manslaughter. These words were used in the instruction and were taken from the code definition. But whatever may have been the intention of the jury, by no possible construction could we reach the conclusion that the jury meant to acquit the defendants, for they not only found them guilty in terms, but recommended them "to the extreme mercy of the court in its sentence and punishment." Whether the crime of which the defendants were found guilty was or was not a felony did not lie with the jury to declare —the statute does this. There is no good reason why the verdict of a jury should not have a reasonable construction and be given effect according to its manifest intention. The words "not a felony" should be rejected as surplusage, and the general verdict of "guilty of involuntary manslaughter" should stand as the verdict.

An affidavit purporting to be signed by eight of the jurymen was read in explanation of the verdict, upon the hearing of the motion for a new trial. The court refused to consider this affidavit, to which defendants excepted. The court regarded the affidavit properly, I think, as an attempted impeachment of the verdict, which it is well settled cannot thus be done.

2. Appellants claim that the record fails to show that the defendants were present at all the stages of the proceedings against them, and the verdict is therefore void. (Citing Pen. Code, sec. 1043; *People v. Kohler,* 5 Cal. 72; *People v. Higgins,* 59 Cal. 357.)

The minutes contain the following entry for May 27, 1896: "The jury, defendant, and all counsel present." In the bill of exceptions is found the following statement: "May 27, 1896, 10 o'clock, A. M., . . . . jury called and all answered present. Defendants and respective counsel present." The minute entry was doubtless a clerical error. There is nothing in the record to show what the fact was as to the defendants being all present on that day. The bill of exceptions was presented by the defendants and allowed by the court, and defendants' motion for new trial is based upon it. We do not think the defendants can now call in question the verity of their own bill of exceptions. Error must affirmatively appear. At most, the minute entry and the bill of exceptions are in conflict as to a fact. If the fact was that the defendants were not all present, they should have made the fact clearly to appear. (*People v. Bealoba,* 17 Cal. 389.) It is further claimed that the record fails to show that the defendants were present when the verdict was rendered, as required by section 1148 of the Penal Code. The minute entry is silent on the subject. If the fact is that defendants were absent when the verdict was rendered, it should have been made to appear affirmatively in the record. Error will not be presumed. On appeal all intendments are in favor of the regularity of action of the trial court. (*People v. Douglass,* 100 Cal. 1.)

3. The evidence tended to establish the following facts: On March 10, 1896, deceased, who was a lather, with his two sons —one a young lad—was working in the third story of the Shirley building, then being constructed on the corner of Fifth and Welch streets, San Francisco. About 10 o'clock of that morning, Waltz, one of the defendants, and Perkins, an indicted defendant who was not arrested, came to this building where deceased and his sons were working. The conversation between Perkins and deceased was not admitted, but that between Waltz and deceased was admitted, with the promise to show its connection with the other defendants on trial. The witness Mars, son of deceased, testified as follows: "Mr. Waltz told my father to quit; my father said he would not quit; both of them chipped in and said, Why are you not going to quit? We said, we are not members of the union, and we are not going to stick out.

We stuck out a week, and we are not members, and we are not going to stick out any longer." Something was said about the price of a day's labor, and the witness was asked to give any further conversation. He continued: "My father said he didn't care what he was getting, he would take the job; he had no standard price; he wouldn't stick out; and Perkins asked him in my presence if he would be willing to pay three dollars a day; that is what the union journeymen was striking for, for eighteen bunches of laths. . . . . He said he was willing to pay three dollars a day for eighteen bunches of laths—eighteen hundred laths for a day's work. They said if he would come down and join the union he would get all the union men he wanted, and he said he would not, and they went away. They returned about three or four that day with forty men—fully forty men." He then named several of the persons as present at this last time, among them the appellants. It was admitted that they were all members of the Lathers' Protective Union. It appeared that the members of the union were on a strike on this day, and had been for ten days previously; that deceased had intended going to work the day before, and went with his sons in the morning to the building "and found four or five of the members of the union down there waiting" for them to come. Witness mentioned two of the defendants among those present at that time. They asked deceased if he and his sons intended going to work, and also if he was going to employ one Haley, to which deceased replied in the affirmative. "They [the union members] went up by the corner of Bryant street, about a quarter of a block away, and stayed waiting there around the hydrant, and Mr. Watson [the contractor] came to the job." Watson and deceased had some conversation which witness did not hear, and he was not permitted to give what his father said about it. He continued: "We came back, and we didn't start the job that morning under something he had in his mind." That evening of March 9th, the day before the alleged homicide, the union had a meeting, at which the following resolution was passed: "Moved and carried that all members who will not work to-morrow meet at Sixth and Market to-morrow morning at 8 o'clock, and appoint a committee to interview all nonunion men. Charge made by Mr. Starr against Mr. Cahill, Trade Brothers and McCluskey,

for violating the rules, referred to the executive committee." It does not appear at what time or place the union men met on the 10th before going to the place where deceased was at work. It does appear, however, that they went in large numbers. One of the defendants, Dunn, was called as a witness for the defense. In his cross-examination and in reply to the question, "Why did you go there in such numbers?" he said: "Well, I don't know why. The men that went there that day, they were men that were not working." Being again asked the question, he replied: "We were all acquainted with him, and each one had a little influence with him to persuade him to quit. We were all acquainted with him, and some of them might have more influence than the others to persuade him to quit; and they all used the same endeavor and talked to him, although I didn't speak to him at all." He was asked if they had any conversation among themselves before going as to what was to be done when they got there, and replied: "Well, no strict understanding; the intention was to go there and talk to him and show him, try to show him, where he was doing us all an injury and an injury to himself by working cheap."

When the defendants and their union friends came to the building, deceased and his two sons and one Mike Haley were working in the third story of the building, deceased and one son on a scaffolding in a hall bedroom; the party came up a narrow stairway not wide enough for two side by side; Haley was working in the back parlor adjoining the hall bedroom; the Mars boy was carrying laths; the lower part of the walls of the rooms was not yet lathed and was open between the studding, except part of the back parlor walls, admitting the passage of a person. The witness Mars testified: "The others crowded in the rear parlor, and still there was a big crowd in the hallway. A man here by the name of Haley, right in this partition under me, stepped up and says: 'Don't you think you fellows have done enough to-day?' I didn't answer him at all; and a man by the name of McCoy [one of the defendants], his head was in this room [showing]. His body was in that room, and his head in that [showing], with his head kind of through the partition, where it was open on the bottom. After Haley said:

'Don't you think you have done enough?' he [McCoy] said:
'Yes, we don't want no scab work.' My father turned around
on the stage and said he was not a scab, and was not doing scab
work, and at this Haley spoke and said: 'You said enough';
and I told my father to say nothing more and don't provoke the
crowd. They told us to come off the stage; three or four of
them said: 'Come down anyway,' and we came down. As I was
coming off the stage here [showing] this man Waltz [one of the
defendants], was standing about here [showing]. He still re-
peated the order to come down from the stage. I was on the
floor at the time. My father was in the act of coming down
off the stage. My father walked from the stage to where Waltz
was standing, and asked him what he had to do about it; Waltz
didn't say anything; my father walked past him to go into the
parlor where his clothes were, and I was going to come up here
by the hall here [showing]; my clothes were there. This man,
Neal Collins [a defendant], while I was walking over to go
through the crowd, he spoke to me; he says: 'Get your father
out of here; get yourself and father out of here; they nearly
killed Trade on Post street'; I was dumbfounded; I didn't know
Trade went to work. I turned to my father to get him down
the stairway. By that time the defendant got himself in this
hallway, between my father and myself; McCoy was in here
[showing]. I could see in the parlor, Haley was here [showing].
Dunn, as I turned to see him—as I turned to get my father
downstairs, I saw Dunn with my eyes hit my father on the back
of his head, on the right side, on the back of his head, with
his fist. My arm kind of went into that room like something
had hold of it; I saw McCoy have hold of his hatchet that way
[showing], and he [his father] kind of locked himself in this
little partition that runs out, his knee and other arm to save
himself from going in the room. Dunn had already hit him.
Haley had his arm drawn back—he struck in the direction of
his face. McCoy had hold of his arm, trying to get him in that
room; I tried to make him break the hold, to get where my
father was, and a couple of men caught me around the neck, and
I went down on the floor hallway. . . . . Some fellow hit me
when I was down; I got up again, and as I got up I heard a
man, a witness in this case, who was in the parlor, saying, 'Don't

strike the old man Mars any more.' That was Billy Dasha.
When they said that the crowd came out, and as they passed me
to go down the stairway one fellow hit me here [showing], and
poked me here [showing]; I was struggling in the crowd; my
father was still in the room with Dasha. After they succeeded
in going down, all of them, I turned to my father, who was very
excited at the time, and showed a mark on his nose here [show-
ing], with a little blood on it, and I told him to go up home
right away, and we would see what we could do. . . . . They
went away in a rush, . . . . down the stairway—the whole
crowd. Q. Where was your brother? A. In the hallway with
me, . . . . they jumped on him as on me. . . . . Mike Haley
said, 'Look out, or you son of a B., don't hit him,' so they went
by and left him alone. Father and I went down the stairway I
was in a pretty bunged-up condition, and I couldn't work any
more; he came down with my brother and Mike Haley to go
home. He was very pale, I could see. He had no marks only this
one over his eye, and a lump on the back of his head. . . . . We
went home. . . . . He went upstairs and laid down on his bed
in his room for about an hour, then came down; supper was
ready at that time, and we tried to get him something to eat;
he wouldn't eat; he took a little drink of tea and went right
back to bed and complained very much of his head, that he had
a bad headache." . . . . The witness was asked what his mother
did, and answered: "She put wet cloths on his head, as wet as
she could get them with ice, and it didn't seem to do him any
good. . . . . About 12 o'clock he got to breathing very hard.
. . . . We tried to wake him up; he didn't know us; he laid there
unconscious. . . . . He was sick nine days, that is, he was un-
conscious, until about 4 o'clock of the morning of the 12th he
came back to consciousness. He lingered without leaving his
bed till the 19th, when he died." As to what occurred at the
building where deceased was at work, there is considerable cor-
roborating testimony given by Haley, the boy Mars, and by
John Knapp, the watchman. The witness Mars, on cross-ex-
amination, when asked if he and his father stopped work volun-
tarily, said: "I stopped work because the committee told me to.
We didn't get down because we wanted to. I was in fear that

the stage would come down from under us if we didn't get down. I thought if we provoked these men to anger they would turn on us and give it to us." He was asked on cross-examination if he saw anybody besides Dunn strike his father, to which he replied: "I saw a man by the name of Haley deliver a blow in the direction of my father, and must have hit him." "Q. Who were beating the old man? A. These men that I had arrested. Q. All these men? A. They were around in the crowd where he was. Q. · Who was it had your father down, beating him? A. These men here that were in the crowd around my father. Q. What men? A. The seven there. Q. You leave out McRae? A. I do; yes. Q. How many men were around you beating you all this time that you saw these men beating your father? A. About twenty of them. Q. Didn't you have all you could do to defend yourself? A. I didn't try to defend myself. I was trying to get where my father was."

It is claimed that the evidence failed to show that the death of the deceased was caused by any acts of defendants. The autopsy physician to the coroner, Dr. Barrett, testified that "death was caused by intra-dural hemorrhage—that is, hemorrhage inside the membrane surrounding the brain. The hemorrhage came from the middle artery, that we call the meningeal median artery." He also testified as to an atheromatous condition of deceased's system—a limy deposit in the membranes of the arteries—which interfered with their functions. As to the cause of the rupture, he testified that "it could be occasioned by an injury, or it might be spontaneous in origin." He further testified that it might have been caused by a blow or a fall—a blow on the right side of the head might have caused it, and could have been produced in a perfectly healthy person; and that excitement resulting from physical injuries might occasion the condition. C. F. Mars, son of deceased, testified: "I saw Dunn, with my eyes, hit my father on the back of his head with his fist." The witness Knapp, watchman of the building, testified that shortly after the defendant left he noticed a small lump on the "right side of deceased's head, back of his head, above the ear." This was also noticed by Thomas F. Mars, son of deceased, immediately after the affray; also by police officer Hurley, and also by the wife of deceased when he came home.

As to what in fact was the immediate cause of the death of deceased—the rupture of a blood vessel—the evidence was not conflicting. The medical testimony, however, clearly left the question with the jury to decide whether the rupture was spontaneous and wholly dissociated from the occurrence of the 10th of March, or was caused by what the defendants did and said and their conduct toward the deceased on that day at the building where deceased was working. The jurors must have found the origin of the rupture to be the treatment the deceased received at the hands of defendants, and we cannot say they erred in reaching that conclusion.

Defendants claim that, if the death of deceased could be accounted for upon any hypothesis other than that of guilt, it was error for the jury not to do so under the instructions given; and that the hypothesis of spontaneous rupture of the blood vessel was presented by the evidence and ought to have been accepted by the jury. The court charged the jury as follows: "1. Before you can find any of these defendants guilty of the crime charged, you must be satisfied beyond all reasonable doubt that the deceased came to his death by some act of violence committed upon him by these defendants, or some of them; 2. If you can account for the death of C. A. Mars upon any other hypothesis than that of the guilt of the defendants, or any of them, you must do so, and acquit the defendants; 3. If you are not satisfied beyond all reasonable doubt as to the cause of the death of C. A. Mars, you must acquit the defendants."

It was within the province of the jury under this instruction to adopt the hypothesis of spontaneous rupture, but the jury were not bound to do so. The question was before them, under the evidence, whether the deceased came to his death through causes occasioned by defendants. This instruction, taken as a whole, did not say to the jury that they might or must adopt any possible theory as to the cause of death, and it would not have been good law if it had.

4. It is further claimed that the evidence is entirely wanting to show a conspiracy within the meaning of the law, and that the instructions of the court in relation thereto, and the liability of all the defendants for the act of any one defendant, were

erroneous, as was also the instruction as to their responsibility as aiders and abettors. The instruction was as follows: "A conspiracy exists when two or more persons conspire to commit an unlawful act or to commit a lawful act by unlawful means. No person has any right, by violence or unlawful means, to prevent another from exercising a lawful trade or calling, or from doing any other lawful act; and if two or more persons conspire together to prevent another person, by violence or unlawful means, from exercising a lawful trade or calling, or doing any other lawful act, and, while engaged in carrying out such conspiracy, they (the conspirators) commit a felony, or some other unlawful act not amounting to a felony, upon the body of the person whom they are so, by violence or unlawful means, striving to prevent from exercising a lawful trade or calling or doing any lawful act, they are all liable for the acts of any one of their number done in pursuance of such conspiracy."

It is contended that there was nothing wrong or unlawful in the action taken by the Lathers' Union on March 9th, the day before the offense is alleged to have been committed; that there was no agreement to commit any battery upon the deceased, or do him any violence; that defendants were doing no unlawful act in asking deceased to quit work the next day when they went in large numbers to the building where he was working; that the conduct of some of the defendants at that time cannot be said to be the ordinary and probable effect of the original intention of all the defendants, and it was error to instruct the jury that all the defendants could be convicted of manslaughter as abettors or conspirators, as it is alleged the court did by this instruction. The defendants are not charged with the crime of conspiracy. The conspiracy element of the crime charged becomes important only as a means of establishing the commission of the crime charged; it is in this view evidence was submitted to show a conspiracy and instructions were given defining it. Conceding that the formal resolution passed by the Lathers' Union, on its face, neither in terms nor by necessary implication, conveyed any intention to commit an unlawful act nor to commit a lawful act by unlawful means, it was still competent to inquire into the subsequent conduct of the members of the

union to ascertain whether or not there was a joint intention, not disclosed by the resolution formed at its passage or subsequently, to do an unlawful act or to do a lawful act by unlawful means. It would rarely, if ever, happen that an association, such as the Lathers' Union, would openly and avowedly enter upon a criminal conspiracy and record the purpose upon its minutes. How far the subsequent conduct of defendants went to establish a conspiracy and to what extent they were involved in it, whether that conspiracy had its origin at the meeting of the Lathers' Union, or later, or at all; whether the crime alleged was committed in pursuance of the conspiracy found to have been formed, or was the act of some of the persons present done "as a fresh and independent product of the mind of some of them, and outside of and foreign to the common design," were questions exclusively with the jury. We cannot agree with counsel for defendants that the "evidence was entirely wanting to show a conspiracy." Two of the defendants with three other members of the union went to the building early on the morning of the 9th of March, where the deceased was intending to go to work "to start the job," and "stood there waiting for deceased to come"; they asked him if he intended to go to work, and if he intended to employ one Haley, to which he said he was; they went away a short distance and remained in sight talking together; the contractor came up, and, after some consultation with deceased, the job was not started that morning. That evening the Lathers' Union passed the resolution already quoted. On the morning of the 10th, deceased and his two sons and Haley went to work; between 9 and 10 o'clock three of the defendants, Waltz, Perkins (who was not arrested), and McRae, came to the building. Waltz told the deceased to quit, and the conversation ensued already given; they went away, and in the afternoon, about 3 or 4 o'clock, they came back, together with the other defendants and thirty or forty of the union members, when the occurrences took place briefly shown by the evidence of C. F. Mars, *supra*. There was evidence tending to show that some of the defendants assaulted the deceased without provocation; that all the defendants aided and abetted and encouraged the assault; that some of the party of union members present

assaulted the sons of deceased without provocation; that the conduct of the party was such as to encourage, rather than discourage, the acts of violence resorted to; that the crowd behaved in a boisterous and turbulent and menacing manner; that when deceased and his son came down from the scaffolding they were forcibly disarmed of their hatchets, for which no apparent necessity was shown, further than by the statement of the only defendant (Dunn) who testified, and he fails to show any justification for the forcible taking away of these implements of labor from deceased and his son. The affray described by this defendant shows that many of the crowd took part in the rough treatment given deceased and his sons, and does not show that it was in any degree made necessary by anything done on the part of the deceased and his sons. They had, in fact, stopped work, and from what appeared by the evidence the alleged object of the resolution of the union was accomplished. The assault came afterward and under circumstances such as the jury might well find was wholly unprovoked and was part of the original design. Whatever of mitigation or excuse might appear from the evidence of Dunn, the most that can be said of it is, that it raised a conflict as to some portions of the evidence of the prosecution, which, under the settled rules of this court, cannot be reviewed. We think, also, that there was evidence sufficient to leave the question with the jury as to the nature and extent of the conspiracy claimed by the prosecution, and as to the guilt or innocence of the defendants in carrying it out.

It is earnestly contended that there is no evidence that there was a conspiracy to use any violence or unlawful means in getting the deceased to quit work, nor any violence used in pursuance of any agreement; that the only agreement shown was to go to deceased and ask him to quit work, and that he complied with their request, and that anything occurring thereafter was an independent act and had nothing to do with the common design; that whatever conspiracy there existed was at an end, and that defendants were no more responsible thereafter than they would be bound by statements of any coconspirator after the termination of the conspiracy. (Citing *People v. Oldham*, 111 Cal. 652; *Snowden v. State*, 7 Baxt. 482.) The rule is well

settled, as stated in *People v. Oldham, supra,* that after the conspiracy is terminated, and the crime has been committed, the admissions of coconspirators are not admissible against others, but the facts and circumstances here raised a question for the jury to decide as to when the conspiracy, if any there was, terminated, and whether the acts of violence proven were not a part of a design to force the deceased to quit work. Some of the defendants had the day before made the request; on the morning of March 10th some of the defendants again requested deceased to quit work, but he refused. When they came a third time and accompanied by a large force of men, and the assault was made as soon as deceased came down off the scaffolding within reach, it was for the jury to say whether this violence was not a part of the original design.

It is also urged that the court incorrectly instructed the jury in the instruction referred to wherein the court stated the law as laid down in *Kelley v. People,* 55 N. Y. 565, 14 Am. Rep. 342, and that, after stating the New York rule on the subject, it failed to state whether it was the law in this state. I think the jury must have accepted the statement as the law here, and, if they did not, no injury could have arisen of which defendants could complain; it would only be in the event that it was bad law, and was followed, that harm could have followed. This method of instructing a jury is not to be commended, but we cannot say it was prejudicial to defendants. The first part of the instruction, already quoted, correctly stated the law, and I cannot discover error in the portion taken from the New York case when considered as part of the whole instruction. The defendants overlook the fact that their acts at the time and place of the assault might properly be considered by the jury as tending to show the purpose and objects of the conspiracy in its inception.

Furthermore, under our statutory definition of conspiracy, I do not think it was essential that the jury should locate the conspiracy at the Lathers' Union meeting, or any other particular time prior to the coming of the defendants to the building; it might have been consummated then and there. If the original agreement was to make a peaceable demand upon the deceased

to quit work, it might have been changed after some of the defendants had called on that morning and were told that deceased intended to go on with his job; it might have been changed upon the arrival of the crowd in the building. The code fixes no time at which the conspiracy must be entered into. Section 182 of the Penal Code defines conspiracy as follows: "If two or more persons conspire: 1. To commit any crime." Section 15 defines a crime or public offense to be "an act committed or omitted in violation of a law forbidding or commanding it, and to which is annexed upon conviction either of the following punishments: death, imprisonment, fine." By section 16 crimes are divided into felonies and misdemeanors. There were involved in the conduct of defendants, if found guilty, both felony and misdemeanor, and it was with the jury to say which of these, and whether the result of a conspiracy or not, and when that conspiracy, if there was a conspiracy, began.

5. The trial court gave an instruction of which the following is the concluding paragraph: "It follows, therefore, if an act is unlawful or is not as duty does not demand, and of a tendency directly dangerous to life, the destruction of life by it, however unintended, will be murder. But if the act, though dangerous, is not directly so, yet sufficient to come under the condemnation of the law, and death unintended results from it, the homicide is manslaughter." The objection made to this portion of the instruction is, that it enlarges the correct doctrine by making a person liable for all possible consequences of his act and is directly contrary to the rule laid down in *People v. Munn,* 65 Cal. 211. In that case the blow was struck upon the head with the fist, under circumstances showing no intention to kill. The person assaulted died from the rupture of an artery inside the skull.

The court instructed the jury that "the law presumes that the natural and even possible consequences were intended by the author of the act. If of sound mind, the natural and proximate consequences. And if the act intended was unlawful, even the possible consequences. So if the act produces harm not intended, it holds him responsible for all the consequences." This was held to be error. The instruction there ignored all distinc-

tion between the intent in committing an act amounting only to a misdemeanor and one amounting to a felony. The part of the instruction before us was preceded by a correct statement of the rule of law in such case as this, as stated by Mr. Bishop, and, taking the whole instruction together, we cannot say that it enlarges the correct doctrine by making a person liable for all possible consequences. The words "or is not as duty does not demand" convey a vague and uncertain meaning, if any at all; but I cannot see that they could have misled the jury.

6. The objection is made that the court instructed the jury that involuntary manslaughter was killing "in the commission of a lawful act, which might produce death, in an unlawful manner or without due caution and circumspection." This is but an extract of an instruction which fully, and we think correctly, defined manslaughter. Whether the defendants peaceably requested the deceased to quit work, as is claimed, and did nothing in that behalf in an unlawful manner or without due caution and circumspection; and whether the deceased after he had quit work so conducted himself as to justify some of the defendants in taking away his hatchet; and, whether the blows struck by some of the defendants after deceased quit work, was all done under circumstances such as to make all the defendants aiders and abettors, was for the jury to decide. This court cannot undertake to judge of the effect of isolated acts of one or more of the defendants and say that the jury erred in holding all the defendants responsible for the consequences flowing from them.

7. It is urged that the court erred in overruling the objection of defendants to certain questions put to the defendant Dunn on cross-examination. He testified in his direct examination quite fully as to the occurrences at the building when the deceased received the alleged injury. I do not think the cross-examination went beyond the limitations prescribed in section 1323 of the Penal Code, as construed by numerous decisions of this court, and find no error here.

The case has had careful consideration, and, as we find no error, it is recommended that the judgment be affirmed.

Haynes, C., and Searls, C., concurred.

For the reasons given in the foregoing opinion the judgment and order are affirmed.

McFarland, J., Temple, J., Henshaw, J.