[Crim. No. 3899. First Dist., Div. Two. Jan. 10, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. FREDDIE SAUCEDA, Defendant and Appellant.

Ruffo & Chadwick for Defendant and Appellant.

Stanley Mosk, Attorney General, John S. McInerny, Albert W. Harris, Jr., and Derald E. Granberg, Deputy Attorneys General, for Plaintiff and Respondent.

KAUFMAN, P. J.—Defendant appeals from a judgment rendered on a jury verdict finding him guilty of two counts of selling heroin in violation of section 11501 of the Health and Safety Code, and from the order denying his motion for a new trial. He argues: that the evidence is insufficient to sustain the verdict on both counts; that the trial court erred in denying his motion to permit the jury to view the scene of the crime; in overruling his objections to certain testimony;

in the admission of certain evidence as well as its instructions to the jury; and finally, that he has been denied due process of law by the People's failure to call the informer-participant as a witness.

The record reveals the following facts: Defendant was charged with two counts of sale, one on May 19, 1960, and the second on May 20, 1960. Both sales occurred in front of the defendant's residence in San Jose, and were set up by the police with the help of an informer-participant, one Nathaniel Bryant, a parolee with a narcotic background who was assisting the authorities to avoid being returned to prison as a parole violator.

The uncontroverted evidence established that the defendant lived at 271 Dupont Street in San Jose. Defendant's home was located on the west side of the street, across from a trucking yard. Dupont Street is only one block long, and runs parallel to the Southern Pacific tracks, between Park Avenue on the north and San Carlos on the side. There were no houses on the east side of the street, only the trucking yard, barren fields and tracks. The defendant's home was one of the few houses on the west side of the street.

On May 19, 1960, at about 9:00 p. m., several police officers met the informer at the parking lot of the Southern Pacific Depot, a few blocks from Dupont Street. They searched the informer and his vehicle, a Buick, and provided him with funds. One of the officers, Sergeant Willis, was secreted in the trunk of the Buick. When the informer left with Sergeant Willis concealed in the trunk, he was followed by a Plymouth containing Officer MacKenzie and Agent Lopez. Another police vehicle, a Ford, containing Agent McHugh of the California Bureau of Narcotic Enforcement and two men from the sheriff's office had already preceded them and parked in the trucking yard opposite the defendant's house. The Plymouth followed the informer's car until he turned off Park Avenue into Dupont and then radioed the Ford parked in the trucking yard that he was coming in. The Plymouth then continued to the next street and arrived at the trucking yard about two-three minutes after dropping their tail of the informer's car.

The informer's car arrived at the defendant's home about 9:12 p. m. As the defendant was not home, the informer drove away followed by the officers in the Plymouth, and then was out of sight of the officers in the Plymouth for about one minute until they picked up the tail on Park Avenue

near Sunol Street. Later, they followed him to a rendezvous point and waited. Then, following the same pattern, they returned to Dupont Street with the officers in the Plymouth again following the informer's car until it turned into Dupont. The officers in the parked Ford saw the informer's vehicle arrive about 9:55 p. m. The defendant was still not at home. About 10:20 p. m., the informer drove away from the area followed by the officers in the Plymouth, apparently to buy some cigarettes, returning by 10:25 p. m. During the five minute interval between 10:20 and 10:25, the informer was out of the observation of the officers in the Plymouth. Sergeant Willis could not tell whether the informer had left the car during these five minutes.

As the defendant was still not at home, Bryant again drove away at 10:27 p. m. and was followed by the officers to the rendezvous point. They decided to look for the defendant at the home of a friend of his at Agnew and so advised the officers in the Ford. The three vehicles proceeded to Agnew together. After a fruitless search, the three vehicles returned to the vicinity of the defendant's residence on Dupont Street about 11:05 p. m. Again, the officers in the Ford preceded the informer and stationed themselves in the trucking yard to maintain their stake-out position while the officers in the Plymouth again followed the informer's Buick until it turned into Dupont Street. At 11:10 p. m., the defendant drove up in a green Ford and parked in the driveway of his home, got out of his car, walked over to the informer's car, entered it, and remained about a minute and a half.

During this time, Sergeant Willis from his position in the trunk, overheard the following conversation: the informer said: "Hi there Frederico. What's happening?" The defendant replied: "Nothing much." When the informer said: "I need two caps," the defendant replied: "Okey. Have you seen Jack?" Bryant replied: "I saw him this morning and he had some stuff." Then, after a portion of the conversation which Sergeant Willis could not hear, the informer said: "Were you going to bed now? I've been here three times today. There's a guy waiting for me at my pad. He wants to pick up some stuff; and as soon as I get some money, I'll be back in fifteen minutes." The defendant's reply was also inaudible to Sergeant Willis. The defendant left the Buick and went into his home.

As soon as the defendant entered his home, Bryant immediately drove away from the area accompanied by the police

vehicles. They returned to the Southern Pacific Depot parking lot, where Sergeant Willis was let out of the trunk and the informer handed two capsules of heroin to Agent McHugh. The time was then about 11:15 p. m.

On the following evening, May 20, a substantially similar procedure was followed. All the same parties and the same vehicles met at the Spartan Stadium at the corner of Tenth and Alma Streets. The informer and his vehicle were again searched and he was supplied with two $5 bills; Sergeant Willis was concealed in the trunk of the informer's Buick. The officers in the Plymouth followed the informer's Buick until he turned off Park Avenue into Dupont, and radioed the Ford parked in the trucking yard across the street from the defendant's home that the informer was coming in.

The officers in the Plymouth arrived in the trucking yard about three minutes after they had dropped the tail on the informer's car. During the wait which ensued, the informer's automobile was approached by two men who had a conversation with him; there was no indication that these two persons entered the informer's car. Sergeant Willis testified that in one of the conversations he overheard, the informer unsuccessfully inquired about the defendant's whereabouts. The defendant again was not at home. After waiting fruitlessly until about 5:45 p. m., the informer drove away from the Dupont Street area. The officers in both cars assumed the informer was returning to the rendezvous point at the Spartan Stadium, waited for him there. The informer thus was out of sight of the officers in both police vehicles for a period of about five to ten minutes. When the informer failed to show up, the officers in the Plymouth returned to the vicinity of the defendant's residence and noticed that the informer's vehicle was back in position. Thus, about 6:20, they resumed their lookout vantage point in the trucking yard across the street as the officers in the Ford had left the area.

At 6:29 p. m., the defendant came out of the front door of his home and again entered the passenger side of the informer's automobile. Sergeant Willis overheard the following conversation: the informer said: "Hello there Freddie. Do you know how long I've been parked out here waiting for you? About three hours. Are you working today?" The defendant replied: "Yes. How many?" The informer replied: "Two. Here's some candy that I ate part of. Take the rest to your children." The defendant then got out of the Buick and returned to his house. Immediately thereafter, the informer

drove to the intersection of Montgomery and Park Avenue where the officers in the Plymouth picked him up and then proceeded to a driveway adjacent to a church. Sergeant Willis was let out of the trunk and the informer turned over two capsules of heroin to Officer MacKenzie. This occurred about 6:33 p. m., just two minutes after the defendant had left the informer's car.

The defendant was arrested on June 9, 1960. Shortly after his arrest, his home was searched pursuant to a warrant. The search revealed some small gelatin capsules in a box in an old Ford parked in the rear of the residence, and in a dresser next to the defendant's bed in his bedroom. The capsules were of the type commonly used to package heroin for sale in the area, and were the same size as the capsules the informer had turned over to the police on May 19 and May 20. When first confronted with the capsules, the defendant stated they were his wife's but after her denial of ownership, he admitted that they were his.

Shortly after his arrest, the defendant was examined by a doctor who found 37 needle marks in his right arm ranging in age from three to thirty days. The defendant's reaction to the Nalline test was negative but showed evidence of use of heroin over a period of time prior to the examination, and he admitted to the doctor that he had used heroin occasionally. He told the doctor his last "fix" had occurred some seven days before the examination. At the trial, the defendant admitted knowing the informer but denied having seen him on the 19th or 20th of May or having sold him any heroin. He testified he had last seen the informer in February and that on May 19 and 20, he was in Oakland and did not return to San Jose until May 21.

The first argument on appeal is that the evidence is insufficient to support the conviction as to both counts. Defendant's chief contentions are that there is no direct evidence to connect him with the heroin presented to the officers by the informer because there is a substantial gap in the chain of proof as in both instances, the informer was not strip-searched and there were periods of time when the informer was out of sight of the officers. There is no merit in these arguments. The record reveals that on each occasion, the informer and his automobile were searched before the sale. The strip-search procedure is neither exclusive nor essential (*People* v. *Givens*, 191 Cal.App.2d 834 [13 Cal.Rptr. 157]: *People* v. *Castedy*, 194 Cal.App.2d 763 [15 Cal.Rptr. 413]).

▇▇▇ Defendant next argues that the above evidence does not adequately negate the possibility that the informer obtained the narcotics from some other person during the times he escaped the observation of the officers. This, however, is not the rule. ▇▇▇ Rather, we must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence and then determine whether such facts are sufficient to support the verdict (*People* v. *Castedy, supra*). ▇▇▇ We think under the circumstances here presented, there is no question that the evidence is sufficient to support the judgment on each count. The location of the defendant's house and the absence of any other people in the area, the fact that on each occasion the informer was out of sight of the officers for only a few minutes, the constant presence of Officer Willis in the trunk of the informer's car, fully justified the jury's conclusion that the informer obtained the heroin from the defendant and not some other persons.

The record indicates that both of the sale transactions were observed by the officers from their vantage point at the yard opposite the defendant's residence. At this point, the officers were only about one hundred yards away and able to observe the participants. The officers used binoculars, and there was ample light from a street light. Under the particular circumstances, the fact that the officers lost sight of the informer for a few short periods of time does not bring this case within the rule of *People* v. *Barnett*, 118 Cal.App.2d 336 [257 P.2d 1041], as argued by the defendant.

Furthermore, on both occasions, the conversations between the informer and the defendant were overheard by the officer concealed in the trunk. In each conversation, they mentioned the number ''two'' which was exactly the amount of heroin later turned over to the police by the informer. There was also the fact of the gelatin capsules found in the defendant's residence and car which were exactly the same size as those later turned over to the police by the informer. This tended to establish the defendant's guilt (*People* v. *Stone*, 89 Cal. App.2d 853 [202 P.2d 333]). Defendant's initial denial of the ownership of the capsules also demonstrated a consciousness of guilt (*People* v. *Stanley*, 162 Cal.App.2d 416, 420 [327 P.2d 973]).

▇▇▇ The next contention is that since the testimony of the various officers who identified the defendant as the person who contacted the informer was a key part of the prosecu-

tion's case, the denial of his motion to have the jury visit the scene of the sales was an abuse of discretion. The trial court denied defendant's motion noting that the picture of the area could be adequately demonstrated to the jury by oral evidence. ▉▉ The grant or denial of such a motion is wholly within the discretion of the trial court (Pen. Code, § 1119; *People* v. *Diaz,* 160 Cal.App.2d 123 [324 P.2d 887]). ▉ We can see no abuse of discretion here. The officers observed both transactions at a distance of about one hundred yards and from the same point. We also note that the defendant apparently did not attempt to introduce photographs or diagrams to visually portray the scene of the crime.

▉ The next argument on appeal is that the trial court erred in admitting testimony about the gelatin capsules found in the defendant's home and in permitting the introduction of the capsules into evidence. Defendant argues that the testimony and these capsules failed to meet the general test of the relevancy of introduction of evidence, and that the presence of the capsules on the premises jointly occupied by the defendant and at least seven other persons three weeks after the offenses has no bearing on the case at bar. We cannot agree. ▉ The possession of instruments commonly used by individuals in the commission of crimes with which an accused is charged is competent evidence on the issue of guilt (*People* v. *Stone, supra*). ▉ The court could take judicial notice of the fact that capsules are used as containers for heroin (*People* v. *Torres,* 56 Cal.2d 864, 866 [17 Cal. Rptr. 495, 366 P.2d 823]). ▉ The uncontroverted evidence established that the capsules were used for this purpose in the San Jose area, and that the capsules found were exactly the same size as those turned over to the officers by the informer. Furthermore, as we pointed out above, the defendant originally denied ownership of the capsules.

▉ The next argument is that the trial court erred in denying his proffered instruction based on section 1118 of the Penal Code indicating that he should be acquitted because the evidence was insufficient on both counts. As we have already pointed out that we found the evidence sufficient, the court's refusal to so advise the jury was correct as such a motion may properly be denied if the evidence is sufficient to sustain a conviction (*People* v. *Hewlett,* 108 Cal.App.2d 358, 375-376 [239 P.2d 150]).

▉ The final argument on appeal is that the defendant was denied due process of law. Defendant argues that this

case comes under the rule of *People* v. *Kiihoa,* 53 Cal.2d 748 [3 Cal.Rptr. 1, 349 P.2d 673], because there the prosecution's failure to call the informer as a witness constituted an intentional suppression of evidence by the prosecution. Defendant's argument is based on the testimony presented on this issue indicating that the informer left for Missouri on June 12 with the consent of the parole authorities. There is no evidence that they sent him there. On the contrary, he went to visit his family. In the absence of evidence that the police sent him out of the state, we cannot infer improper activity on the part of the authorities.

The question here presented has recently been brought to our attention with increasing frequency since the adoption of the rule requiring the prosecution to reveal the identity of the informer (*People* v. *Wilburn,* 195 Cal.App.2d 702 [16 Cal.Rptr. 97] ; *People* v. *Castedy,* 194 Cal.App.2d 763 [15 Cal.Rptr. 413] ; *People* v. *McKoy,* 193 Cal.App.2d 104 [13 Cal.Rptr. 809] ; *People* v. *Robison,* 193 Cal.App.2d 410 [14 Cal.Rptr. 181] ; *People* v. *Givens,* 191 Cal.App.2d 834 [13 Cal.Rptr. 157] ). In all of these cases, as in *People* v. *Kiihoa, supra,* the suspect was not arrested until after the informant had left the jurisdiction. Yet the cases have uniformly held that in the void of specific testimony that the police encouraged the informer to disappear [as was the case in *Kiihoa*], the courts cannot infer improper motives or activities on the part of the officers, but must presume that the officers regularly and lawfully performed their duties (*People* v. *Farrara,* 46 Cal.2d 265 [294 P.2d 21] ), as well as that the payment for and termination of an informer's employment is not in and of itself "encouraging him to disappear." (*People* v. *Wilburn, supra.*) Nor do we think that the fact that the informer here was a parolee who had to receive special permission from the authorities to leave the state constituted an encouragement of his disappearance.

Although not completely clear on the point, the record in this case indicates that the informer did not leave the jurisdiction until about June 12. The indictment was filed on June 9 ; the defendant was arrested on the same date and arraigned on June 10. Thus, the defendant could have taken steps to secure the attendance of the informer as a witness at the trial. Furthermore, when at the time of the trial, the defendant learned that the informer was in Missouri, he could have asked for a continuance to make use of the "Uniform Act to Secure the Attendance of Witnesses from Within or Without a State

in Criminal Proceedings,'' which has been adopted both in this state (Pen. Code, § 1334 et seq.), and the State of Missouri (Vernon's Annotated Missouri Statutes, Laws 1959, H.B. No. 295, § 491.400, et seq.).

Judgment and order denying the motion for a new trial are hereby affirmed.

Shoemaker, J., and Agee, J., concurred

A petition for a rehearing was denied February 9, 1962, and appellant's petition for a hearing by the Supreme Court was denied March 7, 1962. Peters, J., and Dooling, J., were of the opinion that the petition should be granted.