[Crim. No. 8828.   Second Dist., Div. Three.   Feb. 25, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. GEORGE L. CAMARILLO, Defendant and Appellant.

Paul Augustine, Jr., under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and C. Anthony Collins, Deputy Attorney General, for Plaintiff and Respondent.

FORD, J.—The defendant George L. Camarillo was found guilty of two violations of section 11501 of the Health and Safety Code.[1] He has appealed from the judgment.

The evidence which supported the case of the People will be stated. Officer Allen of the Los Angeles Police Department testified that he was assigned to work as an undercover agent with respect to traffic in narcotics. On December 22, 1961, at approximately 3:30 p.m., he met the defendant. The officer was accompanied by Tony DeSilvilla and Danny Aleman. At that time DeSilvilla and Aleman left the officer's automobile and talked to the defendant and then returned to the car with the defendant. Pointing to the defendant, DeSilvilla told the officer that the defendant would "score"[2] for him.

[1] Section 11501 of the Health and Safety Code provides for the punishment of a person "who ... sells, furnishes, ... or gives away, or offers to ... sell, furnish, ... or give away ... any narcotic other than marijuana."

[2] Officer Allen testified as to the meaning of the word "score" as follows: "The term 'score' is a liberal term, it could mean to sell to; to have in possession; or to obtain for possession."

The defendant entered the vehicle and asked, "How much do you guys want?" The officer replied, "I want about a gram." The officer drove his car to the vicinity of the intersection of Brooklyn Avenue and Soto Street. The defendant said, "Now, you guys let me out here. I know a guy who I can score from and he pushes here on the corner." The officer handed DeSilvilla, who was seated next to him, two $10 bills. DeSilvilla handed the money to the defendant who had alighted from the automobile. The defendant then walked towards the corner of the intersection. Thereafter, Officer Allen circled the block several times but he was unable to locate the defendant. After remaining in the vicinity for about an hour and a half, the officer and his two companions departed. Nothing was received in return for the $20 which the defendant had been given.

Officer Allen did not see the defendant again until December 28, 1961. On that date the officer, together with Aleman and DeSilvilla, drove to the vicinity of Whittier Boulevard and Orme Avenue. The defendant was walking on the sidewalk some distance from the intersection. He was with Mariano Quijada, who was known as "Nano." Officer Allen and his companions walked over to the defendant. The officer's testimony as to the conversation was in part as follows: "I asked the defendant what happened to my bread; the defendant stated that some guy had dropped him off on Wabash and he got hung up. He said, 'Man, I wouldn't burn you. That is low. A guy has really got to be low to beat somebody. I wouldn't beat you.'" Aleman asked the defendant if he could "score" for them at that time and the defendant replied that he did not know but he could try.

Thereafter, the five men got into the officer's car and drove to a number of locations until about 6 p.m. During the trip the defendant gave directions as to where the officer should drive. Usually the defendant would leave when the car was stopped and then would return. He would say, "There is nothing happening here," and would direct the officer to drive to another location.

At approximately 6 p.m. Quijada said, "Let's try Mundo." Officer Allen did not recall that the defendant then made any comment. The vehicle was driven to the vicinity of Brooklyn Avenue and Chicago Street. Quijada left the car, went into a telephone booth, and returned a short time later. Quijada said that they could "score" from Mundo and that he would have to call him back in about five

minutes. Then Joseph Trento, who was known as "Hobo," came up and said that he could "score" from Mundo. The officer gave $27 in bills and some change to DeSilvilla who handed the money to Trento. Trento left. The officer and the four other men remained in the automobile. Several minutes later Trento came back, entered the car, and directed Officer Allen to drive to a location near the intersection of Brooklyn Avenue and Breed Street. At that place Trento left the car and was out of the officer's sight for approximately a minute. When Trento returned, he entered the car and said: "I did some good. Let's go shoot."

After Trento returned, the defendant directed the officer to drive to Whittier Boulevard and Orme Avenue. When they arrived there, the defendant said: "We can't all go up and shoot at the same time. There could only be three of us go up at a time." Officer Allen then said, "Let me see the stuff." Thereafter Trento said, "We will keep the stuff until we get up to the pad and we shoot." DeSilvilla said, "Leave the stuff here." Trento then handed the small package to Quijada who examined it. Officer Allen told Quijada that he had a place to "stash" it and Quijada handed the package to him.[3] The officer put it in his sock.

At the time Trento gave the package to one of the other men, the defendant was out of the car and was 20 to 30 feet away. He was walking towards a residential court near Orme Avenue and Whittier Boulevard. Aleman was with him and shortly thereafter DeSilvilla went towards the court. Later Aleman and DeSilvilla reentered the officer's vehicle and the three men drove away. Thereafter, the officer took the package to the police building. Chemical analysis disclosed that capsules in the package contained heroin.

Officer Allen testified that he also bought heroin from Trento on December 16. On that occasion the officer was with Aleman and DeSilvilla.

The defendant testified in his own behalf. On December 22, he saw Aleman, whom he knew, on the corner of Whittier Boulevard and Orme Avenue. The defendant asked Aleman if he could be given a ride to another place on Brooklyn Avenue. After going to the automobile where Officer Allen and DeSilvilla were waiting, Aleman told the defendant that

---

[3]On redirect examination, Officer Allen testified in part as follows: "Q. ... Would you tell us how this package containing the seven capsules—what hands it went through and in what order. A. From Trento to DeSevilla [sic] to Quijada to myself, sir."

it could be done. The defendant entered the car, but he had no conversation with Officer Allen and received no money from him. He never told either Officer Allen or Aleman or DeSilvilla that he would obtain narcotics for any of them. He did see the officer hand some money to Aleman. The defendant got out of the car at a point on Brooklyn Avenue and met his wife in a cafe.

With respect to the events occurring on December 28, 1961, the defendant testified that Aleman said that Mundo would have "stuff" and that he would phone him. Someone did phone Mundo. Later Aleman said that Trento "was going to make it." Trento came to the car, and then left. He returned in about 20 minutes. The defendant saw no package and did not see Trento give narcotics to anyone. The defendant did hear an argument as to where "they were going to go shoot." He settled the argument by saying that they could "shoot" at his apartment. He understood that someone in the group had some heroin. He directed Officer Allen to drive to his apartment. When they arrived there, the defendant said: "We can't all go at the same time. Just three at a time." He, Aleman and DeSilvilla then left the automobile. Both Aleman and DeSilvilla entered the defendant's residence and used narcotics. They remained about six minutes.

With respect to the charge of offering to sell or furnish heroin on December 22, 1961, the trial court gave no instruction to the jury on the subject of specific intent.

The governing law is set forth in *People* v. *Jackson,* 59 Cal.2d 468, at pages 469-470 [30 Cal.Rptr. 329, 381 P.2d 1], as follows: "In *People* v. *Brown,* 55 Cal.2d 64, 68 [9 Cal. Rptr. 816, 357 P.2d 1072], we held that 'a specific intent to sell a narcotic is an essential element of the crime of offering to make such a sale under section 11501.' Persons who offer to sell narcotics with no intention of performing are not engaged in narcotics traffic. Their behavior is not materially different from that of other 'bunco' offenders and is not subject to the severe penalties imposed by section 11501."

In the present case the failure of the defendant to return to the location where he had left the officer's car supported an inference that he intended to use the officer's money for himself rather than for the purpose of obtaining narcotics for delivery to the officer. Under the instructions given by the court in the present case, the jury could have drawn that inference from the evidence and still have convicted the defendant of the crime charged. The defendant's

disclaimer on December 28, 1961, of any intention to "burn"[4] the officer, to which Officer Allen testified, did not preclude such an inference.

The duty of a trial court in a criminal case is stated in *People* v. *Wade*, 53 Cal.2d 322, at page 334 [1 Cal.Rptr. 638, 348 P.2d 116], as follows: "In determining what instructions a trial court is required to give without request, the rule is usually stated to be that the court has a duty to give instructions on the general principles of law governing the case, even though not requested by the parties, but it need not instruct on specific points developed at the trial unless requested . . . . The most rational interpretation of the phrase 'general principles of law governing the case' would seem to be those principles of law commonly or closely and openly connected with the facts of the case before the court." An appropriate instruction on the subject of specific intent was necessary in the present case because it was vital to a proper consideration of the evidence by the jury. (See *People* v. *Holt*, 25 Cal.2d 59, 64-65 [153 P.2d 21].) Since an examination of the record leads to the conclusion that it is reasonably probable that a result more favorable to the defendant would have been reached if an instruction on the requisite specific intent had been given, the error was prejudicial and caused a miscarriage of justice. (*People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243].)

█ In determining the sufficiency of the evidence to sustain the conviction of the defendant for the sale of December 28, 1961, to which Officer Allen testified, this court must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence. (*People* v. *Sauceda*, 199 Cal.App.2d 47, 54 [18 Cal.Rptr. 452].) █ It was a reasonable inference that the defendant and Quijada had the joint purpose of finding someone who had a supply of heroin for sale and that they acted in concert to achieve that purpose. It was also a reasonable inference that the appearance of Trento and the sale of the heroin to the officer constituted the culmination of their efforts. Consequently, the jury could conclude that they aided and abetted Trento in the commission of the crime. (See *People* v. *Conlon*, 149 Cal.App.2d 525, 528 [308 P.2d 402];

---

[4]Officer Allen defined the term "burn," as used by those familiar with traffic in narcotics, as follows: "To give your money for narcotics and then have the person take the money and leave and not give you any narcotics; just to leave on you."

*People* v. *Moore*, 120 Cal.App.2d 303, 306-307 [260 P.2d 1011].)[5]

The contention remaining for consideration is that the verdicts were such as to constitute an acquittal of the defendant of each charge against him set forth in the indictment. In the first three counts of the indictment, Trento alone was accused of violations of section 11501 of the Health and Safety Code on various dates in December of 1961. In the fourth count, only the defendant Camarillo was accused of such a violation, which was alleged to have occurred on or about December 22, 1961. In the fifth count, Trento, the defendant Camarillo and "John Doe 'Nano'"[6] were charged with such a violation, which was alleged to have taken place on or about December 28, 1961. Apparently, the defendant Camarillo was tried separately because Trento and "Nano" had not as yet been taken into custody on the charges against them.

In stating to the jury the nature of the charges before any evidence was introduced, the trial court said: "It is alleged that on or about the 22nd day of December, 1961, in this County, that the defendant, George L. Camarillo, did violate section 11501 of the Health and Safety Code of the State of California in that it is alleged that he did willfully, unlawfully and feloniously offer, sell, furnish and give away a narcotic, to wit, heroin, on or about that date; and there is a further charge to the effect that on or about the 28th day of December, 1961, in the County of Los Angeles, that the defendant, George L. Camarillo, together with two other individuals did willfully, unlawfully, feloniously sell, furnish

---

[5]In the *Conlon* case the court stated (149 Cal.App.2d, at p. 528): "The first contention advanced is that the evidence is insufficient to support the conviction of Conlon for the alleged violation of July 25, 1955. The argument is that not once did Conlon have the marijuana in his possession; that he did not receive any money paid by Alvarez to Staats; that he did not in any way participate in the transaction but was a mere observer. The contention cannot be sustained. The evidence we have heretofore narrated sufficiently shows that he was directly concerned in the commission of the crime and aided and abetted its commission. (Pen. Code, § 31.) He directed Alvarez to the home of Staats, directed him to park in such a way as not to excite suspicion. He went into the Staats house and, inferably, told Staats that Alvarez wanted to buy marijuana. He was present when the sale was made to Alvarez. The jury could conclude that he was so intimately concerned with the whole transaction as to be fairly held to have aided and abetted Staats in the commission of the crime."

[6]As has been noted, there was evidence that Quijada was known as "Nano."

and give away a narcotic, to wit, heroin, in violation of section 11501 of the Health and Safety Code of this State. To these allegations the defendant has entered pleas of not guilty.''

The jury returned two written verdicts of guilty on the forms which had been prepared for their use. The body of one was as follows: "We, the Jury in the above entitled action, find the Defendant George L. Camarillo guilty of a violation of section 11501-*H* of the Health & Safety Code, a felony as charged in *count 1* of the *information.''* (Italics added.) The other verdict was identical except that the reference was to ''count 2 of the information.''

As is hereinafter noted, the verdicts must be considered in the light of the instructions given to the jury. Therein the court referred to "the allegations in the indictment" and, without reference to any specific section of the Health and Safety Code, instructed the jury as follows: "It is unlawful for any person to have in his possession, conceal, transport, carry, convey, sell, furnish, administer or give away, or offer to conceal, transport, carry, convey, sell, furnish, administer or give away, or attempt to conceal, transport, carry or convey, a narcotic. The term 'narcotic,' as used in these instructions, includes heroin." In an instruction relating to the allegations of prior felony convictions, reference was made to the current charge as "the offense of violation of Health & Safety Code 11501.''

No attack was made upon the content of the verdicts in the trial court. The insertion of the letter "H" immediately after the language "section 11501" was obviously a clerical error, as was the use of the word "information" instead of "indictment." The defendant suffered no prejudice because of such errors and they must be disregarded. (See *People* v. *Fisher,* 86 Cal.App.2d 24, 31 [194 P.2d 116].) When the verdicts are read in the light of the record, it is clear that the jury determined all of the issues with respect to the two charges against the defendant ▉ As said in *People* v. *Holmes,* 118 Cal. 444, at page 448 [50 P. 675] : "There is no good reason why the verdict of a jury should not have a reasonable construction and be given effect according to its manifest intention." (See also *People* v. *Mitchell,* 61 Cal. App. 569, 574 [215 P. 117] ; *People* v. *Tognola,* 83 Cal.App. 34, 37 [256 P. 455].)

A similar problem was presented in *People* v. *Harders,* 201 Cal.App.2d 795 [20 Cal.Rptr. 595]. There the court stated, at

page 798: "The defendant first contends there was an error in the verdict. The jury returned a verdict finding defendant guilty of robbery 'as charged in Count I' of the indictment, and a second verdict finding defendant guilty of conspiracy 'as charged in Count II' of the indictment. The original indictment was in four counts; the first count charged defendant and his accomplice, Simon, with the robbery here in question. Counts II and III charged other persons with other robberies, and Count IV charged defendant, Simon and those persons named in Counts II and III with conspiracy to commit robbery. Prior to trial defendant's motion for a separate trial was granted. At trial, and out of the presence of the jury, and by consent of defendant and his counsel, the indictment was amended so as to delete the names of the persons charged in Counts II and III, and as so amended the defendant stood charged in Count I with robbery and in Count IV with conspiracy. The jury found defendant guilty, by separate verdicts, of both robbery and conspiracy. The fact that the conspiracy verdict referred to Count II of the indictment is immaterial, and did not render the verdict invalid. The form of the verdict is unimportant where as here the jury has unmistakably expressed its intention to convict the defendant of the crime of conspiracy."

In *State* v. *Reed*, 55 N.M. 231 [230 P.2d 966], the information originally contained five counts. Counts 2, 3 and 5 were later dismissed. The verdicts returned by the jury referred to the first and second counts of the information. In the course of holding that no error occurred under the circumstances existing in that case, the court stated (230 P.2d at p. 971): "It is well settled that if there is any doubt about a verdict this court is entitled to interpret the verdict by reference to the whole record and particularly by reference to the instructions given by the lower court . . . . There can be no doubt in this case that the jury understood when the case went to the jury that only two charges remained in the information, and that they also understood what those charges were. It is interesting to note that this question was not raised by the attorney for appellants in the lower court, . . ."

In the judgment, reference is made to the counts in accordance with their numerical designations in the indictment. No prejudice has been suffered by the defendant because of the manner in which the charges were described in the verdicts and his contention with respect thereto is without substantial merit.

With respect to the fourth count of the indictment, the judgment is reversed. With respect to the fifth count of the indictment, the judgment is affirmed.

Shinn, P. J., and Files, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 22, 1964.