AMANDA HARTLESS *v.* THE STATE.

1—As an abstract proposition of law, it is conceded that it is not competent, for the State to give in evidence the bad character of the accused, unless the accused has initiated the inquiry by evidence of good character.

2—But it is mainly in cases of doubt about the guilty agent in criminal accusations that character becomes important in public trials.

3—The appellant being on trial for the murder of her husband, the State,

notwithstanding her objection, was allowed to introduce evidence as to her character, although she had not previously put her character in issue by any evidence respecting it. This being assigned as error, it is *held* that, under the circumstances of this case, and the appellant having confessed her participation in the homicide, the evidence as to her character was of no moment, and could have had no influence on the result of the trial; and hence its admission was not error, for which the judgment would be reversed.

4—The court below instructed the jury that "although a homicide may take place under circumstances showing no deliberation, yet, if the person guilty thereof provoked a contest with the apparent intention of killing or doing serious bodily injury to the deceased, the offense does not come within the definition of manslaughter." *Held*, that the instruction was not only correct as a legal proposition, but was applicable to the facts in proof in this cause, and it was, therefore, properly given to the jury.

5—A new trial will not be granted upon an *ex parte* and unsupported affidavit of a convict that by force, fraud, or threats, material witnesses for the defense had been kept from the trial; and especially will a new trial be refused when the absence of the witnesses and the materiality of their testimony were known to the defendant at the trial, and no continuance was asked, nor process to compel their attendance applied for, although they had been duly summoned.

APPEAL from Cherokee. Tried below before the Hon. Samuel L. Earle.

The appellant and one Henry Mitchell were jointly indicted at the Fall term (1868) of the District Court of Cherokee County, for the murder of W. E. Hartless, the husband of the appellant. The death was charged to have been inflicted with a stick and a pocket-knife.

At the same term the accused appeared, pleaded not guilty and obtained a severance. The trial of the appellant ensued, and she was convicted of murder in the second degree, and her punishment assessed by the jury at ten years' confinement in the penitentiary, with hard labor. A new trial being refused, the defendant appealed.

The first error assigned was the admission of "testimony as to the habits, disposition and character of the defendant, as pointed out in her bill of exceptions." It was in proof that the deceased and the appellant had been married about four-

teen years, and had lived amicably together until some two years previous to the homicide; at which time the deceased "put up a still, and commenced making whisky and brandy." The witness for the State, being under his examination in chief, proceeded to state: "Deceased then took to drinking, and the fussing began. I have frequently heard the accused hallooing and screaming as if in distress, since the still was put up; and it became such a common thing to hear her, that it was regarded as a nuisance to the neighborhood. We could tell whenever deceased had made a 'run' of the still, by the hallooing of the accused. I don't know what made accused make this noise; don't know which was to blame for it, she or deceased. Know that deceased was frequently drunk, and accused may have been too. I have seen accused drink whisky, but never saw her intoxicated."

By the defendant's bill of exceptions, it appears that this testimony went to the jury over her objection, and before she had put her character, habits or disposition in issue.

The second error assigned was to the charge delivered by the court to the jury. The charge was very elaborate, but the only portion of it necessary to notice is recited in the opinion. The evidence is quite voluminous, and the salient points of it to which the portion of the charge quoted was applicable are much condensed in the opinion. It appears in the record that David Mitchell was a son of the accused, and that the name of her father was Alexander Gray.

Henry Moore, the first witness for the State, testified, "that on the night of the 22d of August, 1868, Henry Mitchell and Alexander Gray came to his house and asked him to go to the house of the deceased. This was early in the night, and after witness had gone to bed. Mitchell told witness that deceased and his wife, Amanda Hartless, were quarreling, and he wanted him to go with him and Gray and hear it. Witness lives about half a mile from the house of deceased. Witness got up and went over with him to the place where deceased lived. When they got near the house, some twenty steps off, witness

heard deceased and his wife, the accused, quarreling. Witness did not understand what they were saying, but heard deceased say he would bring Moore and his wife over in the morning. Accused then replied something which witness did not understand. Heard the deceased then say, 'I'll stamp your liver out.' The deceased was, at the time, inside the house, and the accused appeared to be outside, in front of the gallery. When deceased said 'I'll stamp your liver out,' witness heard deceased walk across the house in the direction of where the accused was standing. Henry Mitchell, who is the son of the accused, was standing with witness and Alexander Gray, and at the time when deceased said, 'I'll stamp your liver out,' and started towards accused, he, Mitchell, said, 'I can't stand that,' or 'I won't stand that,' or words of similar import, and said Mitchell at once started in the direction of where the deceased and the accused were, and when he had had time to get there they heard a blow with a stick. When Mitchell started, witness and Gray started away, and had got but a short distance when Mitchell overtook them. Mitchell had had time to get to where the deceased was, when they heard the blow. When the blow was struck, witness heard deceased say, immediately after the blow, 'For God's sake, Henry, are you going to kill me?' And witness then heard the accused say, 'You've choked me many a time, and now I'll choke you.' Witness heard nothing further of the struggle."

This was all the evidence as to what occurred at the time and place of the killing. The witness Moore returned to his own house, and in about half an hour after reaching there, as he testified, the accused came there, and, complaining of being sick, called for a bed, which was furnished her. But in a few minutes she came into another room where witness was, and told him that she had killed Hartless. She said she killed him in self-defense. Witness sent for Mr. Dunlap and Mr. Hillon, and they, with witness and the accused, went over to the house of the deceased. The accused showed them where the deceased was lying. He was dead, lying in a corner of the fence,

about fifteen steps from the house. There was a severe wound on his forehead, several inches long, which seemed to have been done with a stick. There were also some ten wounds in his breast and side, which seemed to have been done with a knife.

Dunlap, for the State, testified to much the same effect as to what transpired on this last occasion; but stated that the accused said that she had killed the deceased with a knife, and "that it was not the first time the thing had been thought of." There were several other witnesses who corroborated the foregoing testimony in many respects; but it seems unnecessary further to detail their statements.

The witnesses whose absence was assigned as cause for a new trial, were Alexander Gray, the father of the accused, and Daniel Mitchell, a son of the accused. They had been duly subpœnaed, but no attachment for them was asked, and no continuance applied for.

*M. Priest and Samuel A. Willson*, for appellant, in support of the first assignment of error, cited Wharton's American Criminal Law, 3d ed., 997; Roscoe's Criminal Ev., 98; Peck vs. The State, 2 Humphrey's Tenn. R., 78; and 2 Graham & Waterman on New Trials, 458, note 1, and also page 612.

Under the second assignment they argued the facts of the case, to show that the clause of the charge quoted in the opinion, though correct in the abstract, was inapplicable and calculated to mislead the jury.

In support of the third assignment they cited Paschal's Dig., Art. 3105; 1 Greenleaf's Ev., §§ 34, 35, and 13 a.; Commonwealth v. Webster, 5 Cushing, 296, 310, 319; 16 Texas, 548; 2 Graham & Waterman, on New Trials, 43, 44. They discussed the showing made in support of the motion for a new trial, at length, in connection with the evidence.

*E. B. Turner*, Attorney General, for the State, cited Roscoe's Criminal Evidence, 6th American edition, 94, 95.

LINDSAY, J.—After a thorough and careful examination of the rulings of the court, and of the facts presented in the

record of the proceedings, in the case of the State against
Amanda Hartless, upon a charge of the murder of her husband,
on the night of the 22d day of August, 1868, we have been
brought to the conclusion that there are no such errors made
manifest as would warrant this court in interposing and revers-
ing the action of the court below.

The indictment was for murder.  The finding of the jury,
after hearing the evidence and the charge of the court, was
" guilty of murder *in the second degree,* and confinement in
the penitentiary for a period of ten years."  We think the jury
had abundant reason from the testimony, if credible, (and of that
they were the sole judges,) to justify them in the verdict which
they rendered.   The circumstances conduced most strongly to
show that a conspiracy had been formed, and a plan regularly
laid for the taking off of this victim; and this woman, the
appellant, if not the projector of the scheme and the chief
actor in the complot, at least was present, and aiding and
assisting in effecting the bloody tragedy.

But, notwithstanding this is the obvious complexion of the
testimony to our view, as presented by the record, if there was
such errors of law committed upon the trial as might probably
have worked injustice, and have possibly led the jury to an
erroneous conclusion, to the prejudice of the rights of the pris-
oner, we should feel no hesitancy in arresting the judgment
and granting a new trial.   But we can perceive no such errors
in the record.

The counsel for the convict urges three several considerations
in favor of the reversal of the case, neither of which, in our
judgment, is sufficient to warrant our interposition.   The first
is, that testimony was admitted, touching the character of the
accused, before that character was drawn into issue by the party
herself.   The truth is, in a case like the present, where the
prisoner had confessed her agency in the killing, the character
of the prisoner was of no moment in the investigation, and
could neither avail, if good, nor prejudice, if bad.   It is
mainly in cases of doubt about the guilty agent in crim-

inal accusations, that character becomes important in public trials. As an abstract proposition of law, it is readily conceded that it is not competent for the State to give in proof the bad character of an accused, unless the accused first initiates the inquiry by evidence of good character. In this case we regard the inquiry as wholly unimportant either way, and it could not affect the conclusions to be drawn from the general facts exhibiting the tragical event. The second ground relied upon by the counsel for the convict, is a part of the charge of the court upon the trial, in which it was announced, as law applicable to the facts in proof, that "although a homicide may take place under circumstances showing no deliberation, yet, if the person guilty thereof provoked a contest with the apparent intention of killing, or doing serious bodily injury to the deceased, the offense does not come within the definition of manslaughter." This is conceded to be law, but its applicability to the case is controverted. We think it not only law, but a part of the law exceedingly pertinent and applicable to the facts of this case, and was properly and appropriately given in charge to the jury.

It is very apparent from the evidence that the project was planned and arranged beforehand—that the convict was to provoke a quarrel with her husband, and her son and father were to come forth in the midst of this quarrel, and, then and there, to take such action and perform such deed as the occasion might require. How happened it that the father, who lived three miles off, and whither the son, with his wife, had gone that afternoon, not many hours before the killing, could hear the quarrel between the deceased and his wife, unless a plan had been concerted by which greatly to intensify their sense of hearing, and give them the faculty of distinguishing vocal sounds three miles distant? Yet, the son, with his wife, had gone three miles to stay all night at the father's, and the son and father were back early in the night to hear the quarrel of the husband and wife at the house of the victim! It is most obvious the whole matter was a concerted arrangement among

the parties to bring on the conflict, and they were, severally, at their posts of operations in due time. It was pertinent and proper, therefore, that the jury, upon the state of facts proved before them, should be informed that the law denouncing manslaughter was inapplicable to the case if the contest was provoked with the "intention of killing, or of doing serious bodily injury."

The last ground relied upon is, that three witnesses, who had been duly summoned to testify for the defense, were not in attendance at the trial, and that they had been kept away by fraud, force and threats. The fact of their absence was known to the accused and the attorneys at the time of the announcement of their readiness for, and their engagement in the trial; and they declined even to ask for a continuance of the cause. They chose rather to speculate upon the chances of the verdict, and to risk the appearance of the witnesses during the progress of the trial; and it is but just that they should abide the issues of fate which they themselves created. If it was known to the parties that the witnesses were kept away by force, or fraud, application ought to have been made to the court for its coercive power to remedy the evil. Certainly the case would have been continued by the court until the attendance of the witnesses could have been coerced by attachment. The law does not authorize the granting of a new trial upon an *ex parte* statement of the convict of the absence of material witnesses, kept away by force, fraud or threats, unsupported by other affidavits; especially when that absence was known to the accused at the time of trial, and no continuance asked for, though the witnesses were duly summoned. The judgment is affirmed.

Affirmed.