## EMMA THOMPSON v. THE STATE.

### No. 1716. Decided November 17, 1897.

**1. Murder—Corpus Delicti.**

On a trial for murder, where it appeared that deceased was a strong, healthy man; that he was stabbed in the left breast, immediately under the nipple, in the region of the heart, with a knife proved to be a deadly weapon; that immediately upon receiving said wound he collapsed and fell as if he had received a fatal wound; that he spoke only once, and then only said, "She has cut me;" that he was carried to a house, where he died within fifteen minutes after the wound was inflicted; Held, amply sufficient to establish the fact that the wound was the immediate and proximate cause of the death, though the wound was never probed.

**2. Evidence—Motive of Deceased—Proof of Character of Defendant—Charge of Court.**

On the trial for the murder of a man by a woman, where the court, over objections of defendant, permitted the State to prove that defendant's general reputation for chastity was bad in the community in which she lived; that she kept a house of prostitution, and that she had illegitimate children, and the court in the charge instructed the jury that this evidence was admitted solely for the purpose of enabling them to decide upon the motive of deceased in catching hold of defendant and must be limited to such purpose; Held, error; deceased's motives were not the subject of inquiry. The general rule is, that the prosecution can not inaugurate an inquiry into the general character of a defendant, even upon a matter directly involved in the issue being tried, and defendant's chastity was not involved; and had it been, evidence of particular acts showing a want of chastity would in no event be admissible.

**3. Self-defense—Serious Bodily Injury.**

A party has a perfect right of self-defense under our statute, article 677, Code Criminal Proceedure, against a violent attack threatening serious bodily injury.

**4. Defense of Personal Liberty.**

A party restrained of his or her liberty has the right to resist force by force, but unless the deceased was, at the time, doing some act which reasonably appeared to defendant to endanger her life or threaten her with serious bodily injury, she would have no right to kill him; and if the assault upon her was non-felonious, she would have no right to stab him with a deadly weapon; and the court should have so instructed the jury in this case.

APPEAL from the District Court of Smith. Tried below before Hon. J. G. RUSSELL.

Appeal from a conviction for manslaughter; penalty assessed, two years imprisonment in the penitentiary.

The case is sufficiently stated in the opinion.

*James M. Edwards,* for appellant.—In reference to the admission of evidence, over defendant's objection, showing that defendant's general reputation for chastity was bad; that for several years she had kept a house of prostitution, and that she had given birth to two illegitimate children, one of them being the child of a white man; all of which was duly excepted to by defendant—said evidence was not admissible in order to impeach defendant as a witness, and affect her credibility. 1 Greenl. on Ev., 4 ed., sec. 461, note 2; Boon v. Weathered, 23 Texas, 675; Ayres v. Duprey, 27 Texas, 594; Kennedy v. Upshaw, 66 Texas, 442; Holbert v. State, 9 Texas Crim. App., 219; Railway v. Johnson, 83 Texas, 628; Ryburn v. Moore, 72 Texas, 85; Johnson v. State, 17 Texas

Crim. App., 565; Stayton v. State, 32 Texas Crim. Rep., 33; Burns v. State, 23 Texas Crim. App., 641; Landa v. Obert, 5 Texas Civ. App., 620.

"Evidence of unchastity does not bear upon credibility." People v. Johnson, 106 Cal., 289.

"In impeaching the character of a witness the inquiry must be restricted to his credibility; that is, his general reputation for truth and veracity." Rudstill v. Singerland, 18 Minn., 380.

The rule is that evidence of character must be confined to general reputation, and that particular acts or specific facts (such as that the witness had kept a house of prostitution and had given birth to two illegitimate children) are not admissible either as original or rebuttal evidence as to character. Landa v. Obert, 5 Texas Civ. App., 620; Ryan v. State, 35 S. W. Rep., 288; Howard v. State, 37 Texas Crim. Rep., 494; Moore v. Moore, 73 Texas, 383.

It is believed that the proposition last stated is elementary, and that the authorities supporting the same are abundant.

*Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of manslaughter, and her punishment assessed at two years in the penitentiary; hence this appeal.

The testimony shows, substantially, that the homicide occurred at night, while the parties were returning from a festival given at the house of one Frank Tave. It appears that about 12 o'clock, or a little after that time, the festival broke up; and appellant and Jesse Roberts, as her escort, left the house together. Coming on immediately behind them were Minnie Johnson and Alex Edwards, her escort. When they had proceeded about 150 yards from the house, in the direction of the home of appellant, the party was overtaken by Ben Grant (deceased) and Oliver Roberson. They passed Minnie Johnson and Alex Edwards; and, according to the State's testimony, Oliver Roberson immediately took hold of defendant, and told her that Jesse Roberts should not go home with her. Defendant told him to turn her loose, and he at once turned her loose, and then took hold of Jesse Roberts by the lapel of his coat. As soon as Roberson turned defendant loose, Ben Grant (deceased) took hold of the defendant by the hand or arm, and told her that Jesse Roberts should not go home with her, and that he and Roberson were going home with her. Defendant told Ben Grant to turn her loose, but he still held to her hand or arm. Defendant told him again to turn her loose, and then told him that, if he did not turn her loose, she would cut his heart out. Just then Jesse Roberts said, "Stick it to him;" and at once defendant (Emma Thompson) struck Ben Grant (deceased) with her right hand, and cut him with a knife which she had in her hand. The deceased at once staggered back and fell to the ground; and defendant walked on up the road, saying as she started off, "You need not

be playing drunk, you damn son of a bitch." Oliver Roberson and some of the parties who had come up helped Grant up, and carried him back to Tave's house. The testimony for the State further tends to show that when defendant cut deceased he was doing nothing to her, except holding her by the hand or arm, and insisting that they go home with her, instead of Jesse Roberts. It was also shown that deceased expired shortly after reaching defendant's house, dying some fifteen minutes after receiving the stab. The only expression he used after he fell in the road was, "She has cut me." At the time, deceased was standing in front of defendant, insisting on going home with her, and holding her by the hand or arm, and was holding an oak stick about three feet long and about an inch thick, in his hand, one end resting on the ground. It was shown that Oliver Roberson had accompanied the defendant to the festival on that night, but nothing is stated as to how Jesse Roberts came to be her escort on her return home, instead of Oliver Roberson. It was shown by the State that appellant procured the knife with which she did the stabbing from one Erwin, suggesting that she desired it to cut a toothbrush. She was requested by Erwin to return it to him. The evidence shows, however, that she retained the knife on leaving the festival in company with Jesse Roberts, and had it open in her hand during the route and up to the time of the difficulty. The knife was conceded to be a deadly weapon. After the difficulty, and on her way home, Erwin overtook her, and she then offered him the knife; but he told her that, if she had cut the deceased with it, the court would need it, and declined to take it. As to the wound inflicted, and its being the cause of death, the testimony was to the effect, in addition to what has been above stated, that the wound inflicted was in the left breast of the deceased, just below the left nipple. It was a half or three-fourths of an inch wide. The knife went through the lapel of the deceased's coat, shirt, and undershirt. There was blood on his breast, and there was considerable blood on his clothing. When defendant was called on for the knife with which she stabbed Grant, she gave the same to the officer; and there was blood on the blade, on the sharp point. The wound itself was not probed.

The testimony of the defendant, while agreeing in the main with that of the State, differed therefrom in some essential particulars. The defendant's witnesses show that, while appellant was insisting on deceased turning her loose, she told him that, if he did not turn her loose, she would report him to the justice of the peace, and that then her escort, Jesse Roberts, said, "Stick it to him." It was also shown that deceased struck defendant several blows with his fist, in the breast, before she cut him, and that he was pulling her up the road, telling her in the meantime that he was going home with her. She was resisting and pulling back. To summarize, we quote that part of her testimony in connection with the immediate act of stabbing, as follows: "I told him to turn me loose, and he turned me loose, and stepped over to Jesse Rob-

erts, and took hold of him. The deceased then took hold of my left arm, above the elbow, with both of his hands, and told me that Jesse Roberts should not go home with me, but that he was going home with me. I told him to turn me loose, and I pulled back from him. He jerked me and pulled me along up the road, and I told him that if he did not turn me loose and let me alone I was going to the justice of the peace the next morning and report him. Just then Jesse Roberts said, 'Yes; stick it to him;' and deceased said to me, 'No you won't; you won't get away from here.' Deceased continued to jerk me and pull me up the road, and I continued to pull back from him, and told him to let me alone and turn me loose. While this was going on, I told deceased if he did not turn me loose I would cut him. He continued to hold me by the arm and pull me, and said that if Jesse Roberts went home with me that night he would go over his (deceased's) dead body. While deceased had hold of my arm with one of his hands, and was pulling me, he struck me several times in the breast with his fist of the other hand. I did not know what deceased was going to do to me, and I cut at him with the knife which I had gotten from Alex Erwin, and still had open in my right hand. I do not know whether I cut him or not. I swung my right hand round, and cut at the deceased, and I know that the knife went into his clothing, but I do not know whether it cut his flesh or not. I cut at him to make him turn me loose, and because he had said that I should not get away from there, and because I did not know what he and Oliver Roberson were going to do to me. When Ben Grant fell to the ground, I did not know that I had cut him. I thought he was playing drunk. I did not intend to kill Ben Grant, nor to cut him seriously. I would not have killed him just for wanting to go home with me. I had nothing against the deceased, and would not have cut had I not been compelled to. I did not cut him because he had hold of me." There was furthermore no proof of ill feeling between the parties anterior to the difficulty.

Appellant's first contention is that the corpus delicti is not sufficiently proved (that is, that it was not shown that the wound inflicted by appellant caused the death of the deceased); and counsel cites us to the cases of Lucas v. State, 19 Texas Crim. App., 79, and High v. State, 26 Texas Crim. App., 545. In the Lucas Case, supra, the court holds directly that it was not sufficiently proved in that case that the wound inflicted caused the death of the deceased. In that case, as in this, the wound was made with a knife; and the testimony showed that it was in his breast, just below the left nipple. It was about three-fourths of an inch wide, and was probed by running a stick into it an inch and a half. Witnesses stated, however, that they did not know whether the wound extended to the hollow. The testimony in said case is somewhat meager as to the infliction of the wound by defendant. If it was inflicted by him, it was in the nighttime, and after he had carried the deceased to help him on his horse. The dead body of the deceased was found the next morning. There was testimony of the appearance of blood from the

point where defendant was seen to go away from the deceased to where deceased's dead body was found the next morning, some distance below on the road towards deceased's home; and under deceased's body, beneath the wound, there appeared to be a little pool of blood. The defendant was heard to state, with reference to the wound, "I wonder if I hurt that old man last night when I cut him;" and also to another witness, who told him the next morning after the body was found, "You must have hurt him, Si; you hit him too hard,"—defendant replied, "I think, too, I must have hurt him, for the blood was coming before I pulled the knife out." We have quoted from this case of Lucas, supra, because it is the stronger case of the two, and is more nearly analogous to the present case, as to the facts regarding the corpus delicti. With due deference to the court and learned judge who rendered that opinion, we are inclined to differ with the view taken by the court on this question. We believe that the evidence in that case sufficiently established that the death resulted from the stab with the knife.

In the case at bar there is no question that the weapon was a deadly one, and that the deceased was stabbed with this weapon in the left breast, immediately under the nipple, in the region of the heart—one of the most vital points. It is true that the wound was not probed, but the result and effect of said wound are sufficiently manifested by the fact that, coincident with its infliction, the deceased, who was up to this time evidently a strong, healthy man, immediately collapsed and fell, as if having received a fatal stroke, never speaking but once thereafter, and then simply to remark, "She has cut me;" he was immediately carried to a house, and expired within fifteen minutes after the infliction of the wound. To say that the wound was not the immediate and proximate cause of the death of the deceased, it occurs to us, would be puerile. To illustrate: Two parties are seen engaged in an altercation. One draws a pistol, and fires at his adversary, standing some ten or fifteen steps distant. At the crack of the pistol he immediately falls prostrate upon the ground. He utters an exclamation, "He has shot me!" He lives some ten or fifteen minutes thereafter, and on examination the pistol wound appears to have been inflicted on the left breast, in the region of the heart. No one subsequently probes this wound, but because of this fact to hold that the wound did not cause death, it seems to us, would be to set at naught an obvious fact which accords with common experience, that the bullet shot from the pistol was the proximate cause of death. It occurs to us that there can be no question that the wound inflicted by the defendant upon the deceased, Ben Grant, was fatal, and was the immediate and proximate cause of his death.

Appellant also contends that the court committed a reversible error in admitting the testimony of certain witnesses to prove that defendant was a lewd woman, and to prove particular acts of conduct indicating lewdness. Said bill of exceptions is as follows: "Be it remembered, that upon the trial of the above entitled and numbered cause the State was permitted to prove, over the defendant's objection, by each of the wit-

nesses Warren Roberts, Stuart Smith, and Loftin Arthur the following matters of fact, to wit: That defendant's general reputation for chastity in the community in which she lived at the time she is charged in this case to have killed Ben Grant was bad; that for two or three years next before said alleged homicide defendant 'had kept a house of prostitution at the different places where she had resided in that community during that time; that defendant had never been married; that defendant has two illegitimate children, one of them being the child of a white man. To all of which testimony the defendant, in open court, objected, upon the ground that the same was immaterial, and was wholly irrelevant to any issue in this case, and was strongly calculated to prejudice the defendant, which objection was overruled by the court, and the said testimony permitted to go before the jury in the trial of said cause. To which action of the court, the defendant, in open court, excepted, and tenders this, her bill of exceptions," etc.

The court limited this testimony by the following charge: "The court has permitted the State to call witnesses in this case, and interrogate them as to the character of the defendant for virtue and chastity. This evidence (if you find there is any) is admitted solely for the purpose of enabling the jury to decide upon the motive of deceased in catching hold of the defendant, if you believe he did so, and must be limited by you to such purpose."

Taking this charge in connection with the admitted testimony, whatever might be said of its admissibility as evidence to impeach the defendant, she having testified in the case, it can not be considered for that purpose, as it was admitted by the court and confined by it solely to another purpose. We would, however, remark in this connection that, as this testimony is presented in the bill, we do not believe it was admisssible even for impeachment of the defendant as a witness; the evidence presented involving no criminal charge, and also involving particular acts of misconduct. See Brittain v. State, 36 Texas Crim. Rep., 406.

The question presented for our consideration is, merely, was the testimony of the witnesses to the effect "that appellant's general reputation for chastity in the community in which she lived at the time she was charged with this attempt was bad, that she kept a house of prostitution, and that she had illegitimate children," admissible for the purpose, as stated by the court, to enable the jury to determine the motive that actuated the deceased in catching hold of her and stopping her in the road? This testimony might have been admissible, under certain circumstances, had the deceased been on trial, and his acts and motives the subject of inquiry, but here the defendant was on trial, and her motives and her acts were the subject of inquiry, and what motive may have actuated her deceased adversary in certain acts would not ordinarily be a matter that it concerned the jury to know. The general rule is that the prosecution can not inaugurate an inquiry into the general character of a defendant, even upon a matter directly involved in the issue then being tried. See Whart. Crim. Law, secs. 59, 61, 64, and

Hartless v. State, 32 Texas, 88. And this rule holds good although the effect of the defense be to assume the ordinary good character which is always presumed to accompany a defendant on trial in a criminal case; and, when evidence of the bad character of the defendant has been rendered admissible for the State on account of the course pursued by the defendant, then the State is confined to evidence of general character, and is not authorized to prove particular acts of bad conduct. This question came up in the case of People v. Fair, 43 California, 137, in much the same way as in this case, and was there critically discussed; and the reasoning of the court, we think, is unanswerable, and is applicable to the evidence here offered. From no point of view in which the matter can be considered was the evidence admissible. Appellant's chastity does not appear to have been in any way involved in the homicide. If it had been, before the State could have offered testimony impeaching or impugning her chastity the defendant must herself have made the issue, by offering proof of her character in that particular. She offered no such proof, and the State was not only not entitled to take the initiative in this respect, but in no event was it authorized to introduce evidence of particular acts showing a want of chastity on the part of appellant. We hold that the evidence was clearly not admissible for the purpose for which it was permitted by the court to be introduced on behalf of the State.

The remaining question to be considered in this connection is, was the testimony of that material character requiring a reversal of this case? If, as viewed from the evidence, under no circumstances were the jury authorized to acquit the defendant on the ground of self-defense, then, as the jury found her guilty of the lowest grade of criminal homicide (that is, manslaughter), the error in admitting the testimony was immaterial. In reviewing the evidence, there was some testimony tending to show malice. There was also a well marked phase of the case involving manslaughter. The court gave a charge to the jury both on murder and manslaughter, and also gave a charge on self-defense; evidently believing that appellant was entitled to such a charge, under the evidence. Unquestionably, if the testimony offered by the defendant showed that, on account of the violence of the assault made on her, she reasonably apprehended danger to her life, or serious bodily injury to her person, then the court was bound to give the jury a charge on self-defense. Recurring to her testimony—and this presents this phase of the case most strongly—we gather that deceased and his companion were entirely in the wrong in endeavoring to force her to leave her escort, Jesse Roberts, and compel her to allow them to escort her home. She says, "I cut at him to make him turn me loose, and because he said I should not go away from there, and because I did not know what he and Oliver Roberson were going to do with me." In this connection the evidence showed that he was much stronger and more powerful than she was; that he not only took hold of her and restrained her, but that he held in his

hand a large stick, and that he struck her several blows in the breast with his fist. Under the circumstances, we can not say that she did not, from her standpoint, reasonably apprehend danger to her life, or serious bodily injury to her person, on account of the attitude of her assailant, and we do not believe that the court would have been authorized to withhold from the jury a charge on self-defense; and, as she was entitled to this charge, we can not say what effect the admission of the illegal testimony may have had upon the jury. They were instructed by the court to regard her as a lewd woman and a prostitute; and this fact, by the instruction of the court, authorized them to believe at least that the deceased could make an assault upon her which he·was not permitted to make upon another, and so her rights of self-defense were restricted by this admitted right of interference on his part. We do not believe that the court was so authorized to restrict her right of self-defense, and the admission of. this evidence, in connection with the charge of the court, may have been injurious to the appellant.

The court, in his charge on self-defense, instructed the jury under article 677 of the Penal Code of 1895, which authorizes.the slaying of one's adversary in the protection of the person against any other unlawful and violent attack besides one with intent to murder, or to inflict serious bodily injury. The court, however, eliminated a defense against a violent assault, where the attack was with intent to inflict serious bodily injury, by erasing this sentence from the charge. This, in our opinion, was error. We do not undertake to say, however, that it would constitute such error as would reverse the case, in view of the fact that the court, in applying the law to the facts on this phase of the case, gave a charge in accordance to said subdivision of the statute, giving one the right of self-defense where a violent attack was made with ·intent either to murder or to inflict serious bodily injury. In another portion of the charge the court instructed the jury on the right of self-defense, as viewed by us, with far more liberality towards the defendant than is authorized by law. The charge in question is as follows: "If you find and believe from the evidence that the said Ben Grant had seized the defendant, and was preventing her from going to such a place as she saw fit, or was in any way restraining the defendant in her freedom of locomotion, then you are instructed that the defendant had a right to relieve herself from such restraint and regain her freedom of locomotion, and for this purpose she had the right to employ such force and resort to such means as might be necessary, or as reasonably appeared to her to be necessary, to effect such object; and if you believe from the evidence it was necessary, or if it reasonably appeared to the defendant to be necessary, in order to regain her freedom of locomotion, to strike said Grant with a knife, in order to regain her said freedom, and in order to so regain her freedom and relieve herself from restraint she so struck the said Grant with the said knife, she will not be guilty, and you will acquit."

While the defendant does not complain of this charge, yet we do not conceive that such is the law. Undoubtedly a party restrained of his or

her liberty has the right to resist force with force, but unless the deceased, at the time he was restraining her, was doing some act which reasonably appeared to the defendant to endanger her life, or threaten her with serious bodily injury, then she had no right to take his life; and unless the violence of his assault in his attempted restraint of her was such as to reasonably cause her to apprehend that he was about to take her life, or to inflict upon her serious bodily injury, she had no right to kill him. If he was merely, in such attempted restraint, making upon her a non-felonious assault—such assault as if, she being a man, would have been merely a simple assault—and the nature of the assault did not reasonably create in her mind danger of life or serious bodily injury, she would have no right to stab with a deadly weapon. One phase of this case for the State presents this theory of a non-felonious assault (that is, an assault involving no danger, real or apparent, to life, or serious bodily injury to the defendant); and this phase of the case should, as a part of the charge, have been given to the jury. See note to Gallagher v. State, Horr & T. Cas. Self-Def., 723. For the error of the court in admitting the testimony above discusssed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

HURT, Presiding Judge, absent.