EDWARDO VELA v. THE STATE.

No. 1061. Decided April 5, 1911.

Rehearing Denied May 17, 1911.

**1.—Murder—Corpus Delicti—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence did not even suggest that deceased died from any other cause than that of the criminal act of the defendant, the conviction is sustained.

**2.—Same—Charge of Court—Corpus Delicti—Cause of Death.**

Where the court instructed the jury that the State must prove by competent testimony beyond a reasonable doubt not only that the defendant shot the deceased, but that the shot was the actual cause of his death, there was no error. Following Thompson v. State, 38 Texas Crim. App., 335, and other cases.

**3.—Same—Circumstantial Evidence—Charge of Court.**

Where the evidence was positive and direct there was no error in the court's failure to charge on circumstantial evidence.

**4.—Same—Charge of Court—Self-Defense.**

Where the court properly submitted the issue of self-defense in his main charge, and also submitted special instructions requested by the defendant covering the various phases of the testimony, there was no error in refusing other instructions relating to the same matter.

**5.—Same—Continuance—Impeaching Testimony.**

Where the absent testimony alleged in defendant's application for continuance was of an impeaching character, there was no error.

**6.—Same—Charge of Court—General Exceptions.**

Where the complaint to the court's charge is of a general character, and the error is not pointed out, the same can not be considered on appeal.

**7.—Same—Charge of Court—Practice on Appeal.**

Where no objection was made to the court's charge in the court below or error assigned in the motion for new trial, the same can not be considered on appeal.

Appeal from the District Court of Caldwell. Tried below before the Hon. L. W. Moore.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*E. B. Coopwood,* for appellant.—On question of the insufficiency of the evidence on the corpus delicti: Hamby v. State, 36 Texas, 523; Lovelady v. State, 14 Texas Crim. App., 545; Walker v. State, id., 609; Lucas v. State, 19 Texas Crim. App., 79; High v. State, 26 Texas Crim. App., 545; Follis v. State, 51 Texas Crim. Rep., 186, 101 S. W. Rep., 242.

*C. E. Lane,* Assistant Attorney-General, for the State.—On question of court's failure to charge on circumstantial evidence: Sellers v. State, 134 S. W. Rep., 348.

HARPER, JUDGE.—In this case the appellant was indicted in the District Court of Caldwell County, charged with the offense of murder. Upon a trial he was adjudged guilty of murder in the second degree, and his punishment assessed at five years confinement in the penitentiary.

1. The first ground in the motion for a new trial complains that the evidence is insufficient to sustain the judgment, and under this defendant insists that it is not shown that defendant killed the deceased, and that the evidence does not preclude the idea that deceased may not have died from other causes.

The shooting took place at the home of a Mexican where there was to be a dance, but the musicians failed to appear. Pablo Rodriguez

testifies: "When deceased came there he got out of the buggy and hollered. I told him not to holler; he then went back to the buggy and was leaning on the wheel when defendant shot him. I did not hear him say anything, and did not hear defendant say a word. Defendant then went around the buggy and shot Senovia. I was in position to see the pistol when he shot deceased. Deceased was shot in the right side about an inch below the ribs. I stayed there until after deceased died. I do not remember any more than that he was killed. Deceased did not have a knife or a pistol." Senovia Remires testified: "I was with deceased. Deceased got out and hollered; he walked around the buggy, and was leaning on the back wheel when defendant shot him. He is the same man that shot me. Deceased did not have a pistol." Felipe Villalobos says he heard the first two shots and went to the scene of the shooting. Defendant had a pistol in his hand. Deceased was lying on the ground. He died in an hour and a half or two hours. I was present when he died. Christobal Sosa and Mattea Rocha also testified to deceased being shot in the side, and dying the same night.

The court gave the following charge at the request of the defendant: "You are further instructed that before you can convict the defendant in this case, the State must prove by competent testimony, to your entire satisfaction, and beyond a reasonable doubt, not only that the defendant shot the deceased, but that the shot was the actual cause of his death. And if you believe that the State has failed to make such proof, or if you have a reasonable doubt of such·fact, then you must acquit the defendant."

The court also presented this question in his main charge, and instructed the jury that if the jury had any reasonable doubt that defendant shot deceased they would acquit him, or if they had any reasonable doubt that the wound inflicted was the cause of death, they could not convict defendant of murder in either degree or manslaughter. The jury under these charges found that defendant fired the shot, and this was the cause of death. There was evidence upon which to base such finding. One or more of the witnesses testified that deceased was shot in the side below the ribs; that defendant did the shooting. In the entire record there is nothing suggested that could have caused his death other than this shot. He is not shown to have been suffering from any disease, but is driving around in apparently sound health until just a few moments before he was shot. At the time he is shot he drops to the ground, exclaiming that he is "hurting in the stomach" (the place where he was shot), and lies there until he dies. In the case of Thompson v. State, 38 Texas Crim. Rep., 335, this court says:

"In the case at bar there is no question that the weapon was a deadly one, and that the deceased was stabbed with this weapon in the left breast, immediately under the nipple, in the region of the heart— one of the most vital points. It is true that the wound was not

probed, but the result and effect of said wound are sufficiently manifested by the fact that, coincident with its infliction, the deceased, who was up to this time evidently a strong, healthy man, immediately collapsed and fell, as if having received a fatal stroke, never speaking but once thereafter, and then simply to remark, 'She has cut me;' he was immediately carried to a house, and expired within fifteen minutes after the infliction of the wound. To say that the wound was not the immediate and proximate cause of the death of the deceased, it occurs to us, would be puerile. To illustrate: Two parties are seen engaged in an altercation. One draws a pistol and fires at his adversary, standing some ten or fifteen steps distant. At the crack of a pistol he immediately falls prostrate upon the ground. He utters an exclamation, 'He has shot me.' He lives some ten or fifteen minutes thereafter, and on examination the pistol wound appears to have been inflicted on the left breast, in the region of the heart. No one subsequently probes this wound, but because of this fact to hold that the wound did not cause death, it seems to us, would be to set at naught an obvious fact which accords with common experience, that the bullet shot from the pistol was the proximate cause of death. It occurs to us that there can be no question that the wound inflicted by the defendant upon the deceased, Ben Grant, was fatal, and was the immediate and proximate cause of his death."

This holding of our court is approved in the text in 21 Cyc., page 999, where it is said: "Where a cause is shown sufficient to produce a complication resulting in death, and no other cause is shown to have existed, a sufficient basis for the conclusion that the result arose from the known cause is afforded. A mere possibility that death resulted from some cause other than the act of accused will not overcome facts proved leaving no rational grounds for doubt,' citing People v. Holmes, 118 Cal., 444; Cox v. People, 80 N. Y., 500; People v. Farrell (Mich.), 100 N. W., 264; State v. Murphy, 9 Nev., 394; Mayfield v. State, 101 Tenn., 673; Waller v. People, 209 Ill., 284.

The holding in the Thompson case, supra, was approved by this court in the case of Scott v. State, 47 S. W. Rep., 531.

2. There was no error in the court not giving in charge the law applicable to circumstantial evidence. A witness testified positively that he saw the defendant shoot the deceased with a pistol, striking him in the side just below the ribs, and it is a matter of common knowledge that this is a dangerous wound.

3. The appellant complains because the court did not give special charge No. 2 requested by defendant. This charge was fully covered by the main charge in the following two paragraphs:

"A reasonable apprehension of death or serious bodily harm will excuse a party in using all necessary force to protect his life or person, and it is not necessary that there be actual danger, provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time, and in such case the party acting

under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant.

"If from the evidence you believe the defendant killed the said deceased, but further believe that at the time of so doing the deceased had made an attack on him which, from the manner and character of it, caused him to have a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation or fear, the defendant killed the deceased, then you should acquit him."

The court gave four special charges requested by defendant, which, in the light of the main charge, presented every theory of defendant's innocence and defense, and there was no error in refusing to give the other special instructions requested.

The jury were told, at the request of defendant: "If you believe from the testimony in this case, that on the night of the killing, certain parties made an unlawful attack upon the defendant, and that from such attack the defendant was in danger of his life, or serious bodily injuries, then you are instructed that the defendant had the right to use all means and force necessary to repel said attack, and to kill his assailants if necessary. And if you find from the testimony that the defendant fired a pistol at the parties making said unlawful assault upon him, and that the same was done to repel the attack then being made upon him, and that if firing said pistol at the parties so making said unlawful attack upon him, he shot and killed the deceased, then you are instructed that the defendant would be justified under the law, although the deceased was not one of the parties making said assault upon the defendant, and if you so find you will acquit the defendant."

"You are further instructed that although you may believe from the testimony that no unlawful attack was made upon the defendant at the time of the killing, and that he himself made an unlawful attack upon the other parties, still if you further believe from the testimony that after the defendant fired his pistol, that the other parties fired their firearms, and that the deceased was shot and killed by one of the shots fired by parties other than the defendant, then you are instructed that under the law the defendant would not be guilty, and you should acquit him. Or if there exists in your mind a reasonable doubt, as to whether the fatal shot was fired by the defendant or by some other party, then under the law you must give the defendant the benefit of the doubt and acquit him."

When the court presents the issues in his charge in chief, and then gives special instructions requested covering various phases of the testimony, there is no error in refusing other instructions relating to the same matter, being in effect the same charge, although differently worded.

4. Appellant complains of the action of the court in refusing to continue the case on account of the absence of a witness. As modi-

fied by the approval of the court, there would appear no error, but it appears by reading the application that all it was expected to prove by this witness was that one of the State's witnesses had made a different statement shortly after the shooting differing in many respects to the evidence of the witness on this trial, and which statements were denied by the witness. "A new trial will not be granted which is based upon the action of the court in refusing a continuance, when the only purpose of the absent witness was to impeach a State's witness. (Atkins v. State, 11 Texas Crim. App., 8.) "Where the testimony sought could only be available to impeach a State's witness, the continuance should be refused." (Garrett v. State, 37 Texas Crim. Rep., 198.) See also Rodgers v. State, 36 Texas Crim. Rep., 563; Butts v. State, 35 Texas Crim. Rep., 364.

5. There are several complaints of the charge of the court, but no effort is made to point out any error therein, the complaint being too general to be considered. The charge presents the law as applicable to murder in the first and second degrees, manslaughter, and aggravated assault, and the jury is specifically informed that defendant can not be convicted of either murder or manslaughter unless they find beyond a reasonable doubt that he fired the shot and this was the cause of the death of deceased.

Appellant's counsel has ably presented the view of the case that the death of deceased is not shown to have been caused by the shot. The evidence does not suggest any other cause of death, even remotely, and as the contention of defendant hangs around this proposition all the way through the case, and having held that under the facts the jury, under a proper charge, would be authorized to find that this was the cause, and they having so found, there is no error suggested upon which we would be authorized to reverse the case.

The judgment is affirmed.

*Affirmed.*

### ON REHEARING.

#### May 17, 1911.

HARPER, JUDGE.—This case was affirmed at a former day of this term, and appellant has filed a motion for rehearing, and an able brief, in which he attacks both the conclusions of fact and law as announced in the original opinion.

The main contention of appellant is that we erred in holding that the corpus delicti was sufficiently established by the evidence, and cites a number of authorities, none of which, however, we think bear out his contention, for in this case, in the entire evidence, there is no suggestion that deceased may have died from any cause other than the shot in the stomach, and the evidence establishes beyond question that defendant fired the shot. Pablo Rodriguez testified:

"I was about ten steps from Edward (defendant) when Joe (deceased) drove by him. Joe came down the road there and was coming

to Matia's house. When Joe got to where they were standing by the
side of the road he stopped the buggy and got out and started to
where the men were and hollered one time. It was Joe, the dead
man, that did that. I don't think he took over five steps from his
buggy before he hollered. I then told Joe not to holler, and he asked
me why, and I told him that the other men might get insulted; it
was Joe Castillo, the deceased, that did the hollering. Joe asked me
then were these bad men, and defendant says, 'What is that for.' I
didn't say anything, but Joe walked back to the buggy and leaned
up against the buggy; leaned up against the hind wheel of the buggy.
At this time Senovia was on the buggy seat then. I don't know about
the distance that I was from Joe's buggy, but I was standing right
about even with Joe's horse's head. I was about as close to Joe as I
was to Edward. When Joe returned back to the buggy he was stand-
ing with his back to the buggy wheel. Edward was right straight in
front of him then; when Joe returned over to the wheel of the buggy
and leaned up against the wheel, Edward walked straight over to
where Joe was; this was while Joe was leaning up against the buggy
wheel. When he walked over there toward him he shot him with a
pistol. I was in a position to see that pistol when he shot, and when
he pulled that pistol and shot him, I saw that. Just before the shot
was fired I did not hear Edward nor Joe say anything. After the
shot was fired Joe was still there and Ed started in rear of the buggy
and Senovia started to get out of the buggy, and that is when he
shot Senovia Remires in the leg. Senovia was sitting on the seat
at that time and Joe was leaning against the hind wheel; after he
shot Joe and passed around the buggy he saw this other man
Remires getting out of the buggy and whirled and shot him, too; then
defendant broke and run. When the shots were fired they were so close
together and I got so frightened and I didn't hear anything said if
they said anything. Just after the shots were fired Joe, the deceased,
made a few steps and come back and told me that his stomach hurt
him, and I asked what was the matter, and I told him that I thought
he got hurt; told him that he had got shot. He got shot in the right-
hand side; the ball didn't go through him. I do not know where
Edward was then; he broke and ran and I don't know where he was
as I gave my attention to Joe. I didn't see a pistol or knife or any-
thing there by Joe; he never had anything. Joe hadn't been there on
the grounds ten minutes before he got shot."

On cross-examination he testified: "I was standing right opposite
Joe's horse's head, and I don't know, but I guess, that it was about
ten steps from the horse's head, and Joe was standing at the back
wheel; that would be about the middle of the buggy between the
wheels. Edward (defendant) started right straight toward Joe and
passed him and shot. Then he passed the hind wheel of the buggy;
he was going then from the buggy and passed. He went straight
across in rear of buggy. This defendant was standing right across

from the hind wheel and Joe standing across this way and he went around the back of the buggy. He went about as far as from here to the pillow there when he fired the first shot. He hadn't gotten on the other side of the buggy when he shot; he was right there even with the wheel, on the one Joe was leaning against. He came along even with the wheel on the other side and shot back. I mean he passed around the buggy and shot back when he shot the second shot. I stood there until Joe walked off and started back there to me and said his stomach hurt him and I went up there to where he was. The only one I saw come back was Joe, when he leaned up against the buggy; Joe didn't ever change his position until after the shooting. Joe was shot in the right side and a little in front, about an inch and a half below the ribs; I didn't hear but two shots. I stayed there that night after the shooting; I stayed there until after the deceased died. I was here in court when they had the examining trial. The State didn't put me on at all; I didn't testify at all. I don't remember any more than that he killed him there."

Senovia Ramires testified: "Joe did not speak to anyone before he hollered there in the road. At that time I did not know of any trouble between Edward and Joe. When the buggy stopped Edward and these two or three other men were standing on the righthand side of the road. I did not hear anyone speak to Joe before he hollered. When the buggy stopped they were on the righthand side of the road. I don't know where Pablo came from, but I saw Edward standing there on the righthand side of the road. When Joe got out he never did anything but holler, and just hollered one time. I didn't see anything in his hand at that time; neither of us had anything in our hands at that time. Neither of us had a pistol. Edward was about three steps from the buggy when it stopped. When Joe got out of the buggy he walked around to the back of the buggy, and Edward was still standing off from the buggy. Joe was standing back of the buggy wheel and this fellow shot him; Ed shot him. At the time he was shot he was standing back of the buggy by one of the hind wheels. He was standing on the righthand side of the hind wheel."

Felipe Villalobos testified: "I said that I didn't see the first two shots. I was off from them about twenty-five yards. There were a few trees around there. After the shots were made I found Joe, the deceased, lying there on the ground. As soon as those shots were fired I went up where I heard the first two shots. There were a good many people there, but I couldn't name any of them at all. A good many of them came after I got there. Joe was still alive when I got there; he lived about an hour and a half or two hours; I was present when he died. I don't know where Christoval Sosa was at the time of the shots being fired. I went down there where the shots were fired and then found Joe shot and the crowd of other Mexicans there."

Christoval Sosa testified: "When I heard those shots what were fired there I was coming from the crowd where John Fosta was and heard two shots and Martia ran to see who it was that shot and I ran to the house and found that fellow Joe Castillo; when I got up there I says howdy, and I says, 'Who is that?' and he says, 'I am Castillo, and I am mighty sick; and I don't know what is the matter with me, but I have got a hurting in my stomach;' he says, 'I have got a shot and come and see me.' I went close to him and he told me to strike a match and see if he got shot or not. I struck a match and saw that he got shot right here in right side. I asked him who had shot him and he said Vela."

On cross-examination he testified: "Joe was shot in the right side; I saw the hole; I saw the blood; he was shot here, from the front here. And the shot and everything was there when I saw that. The blood was on the inside. I saw that blood and I found out that that was blood. That is what I am trying to say now, that there was no blood except where the bullet hole was."

Mattea Rocha testified he heard the shots, but did not see the shooting. He went to deceased as soon as he heard the shots, and learned that he was shot, when he tried to overtake defendant. That deceased died that night. He did not touch him until after he died, and did not examine him until after his death.

Felix Vela, a brother of defendant, testified he and defendant went to the place together in a buggy. That defendant left there right after the shooting, and he did not find out where he went to until he got home. That his brother did not tell him why he run off.

As stated in the original opinion, in this case, in the evidence there is no suggestion even that deceased died from any other cause, and in addition to the case of Thompson v. State, cited in the original opinion, this court held in the case of Scott v. State, 47 S. W. Rep., 531: "Appellant insists that the corpus delicti is not sufficiently proven, that is, that it is not shown by a sufficient certainty of proof that the wound inflicted was a mortal wound, and that deceased's death was occasioned thereby. The proof here shows that defendant cut deceased with the ax, and that it made, according to the witness, 'a big wound;' that deceased immediately staggered, and leaned against the house, then directly walked from the house a little piece and fell. He is only shown to have uttered one exclamation after defendant struck him the blow, to wit: 'What did you cut me with the ax for?' He had to be picked up and carried to his home, and a doctor was at once sent for, who attended him on the same day; he was in good health at the time he was cut by defendant; that he never got up from his bed; that he died at his home on the following Wednesday, three days thereafter. No question appears to have been made as to this matter on the trial of the cause. No doubt, if the question had been raised during the progress of the trial, and not apparently con-

ceded, the proof would have been full upon this point, but it by no means follows that the proof here exhibited is not complete, establishing to the satisfaction of the jury the fact that the deceased came to his death on account of said wound. In our opinion, there was no error in the refusal of the court to entertain a motion for a new trial on this ground."

As said in the Scott case in the introduction of the evidence, this did not appear to be a contested issue, and in accordance with these decisions we hold that, inasmuch as it is positively testified that defendant shot deceased and he died in an hour or so, and that the only cause suggested by the record as the cause of his death was the wound in the stomach, the corpus delicti is sufficiently proven. We have read the authorities cited by appellant, and in each of them there was in the evidence some suggestion that the deceased might have died from other causes. And as in this case, the direct testimony as copied above, showed that defendant fired the shot that caused the death of deceased, there was no necessity to charge on circumstantial evidence. The court submitted the issue, under a proper charge, whether or not the death was caused by the shot fired by defendant, and we do not feel inclined to overrule the Scott and Thompson cases, but think they are correct in their holding.

Appellant insists that we should consider his eighth assignment of error, in which complaint is made in regard to the charge on murder in the second degree. No such ground was assigned in the motion for a new trial, no complaint made of the charge in this respect in the trial court, and we can not consider errors in the charge assigned for the first time in this court.

All the matters complained of in the motion for a new trial were passed on the original opinion, and such matters as were assigned in the brief which have no basis in the motion for a new trial, were not then and can not now be considered by us without overruling an unbroken line of decisions in this court.

The motion for rehearing is overruled.

*Overruled.*